Michelle Renee SIGMAN, on her behalf and as Guardian Ad Litem for James Douglas Sigman, a minor, and as personal representative of Taylor McKenzie Sigman, deceased; James Douglas Sigman, a minor; Taylor McKenzie Sigman, deceased, Plaintiffs–Appellants,

v.

UNITED STATES of America, Defendant–Appellee.

Lorraine T. Murray, a single woman, Plaintiff–Appellant,

v.

United States of America, Defendant–Appellee.

Hazel Roberts, wife; Harold Roberts, husband, Plaintiffs–Appellants,

v.

United States of America, Defendant–Appellee.

Pauline Brown, Plaintiff–Appellant,

v.

United States of America, Defendant–Appellee.

Marilyn Moe, Plaintiff–Appellant,

v.

United States of America, Defendant–Appellee.

Marlene Moe, on her own behalf; Melissa Moe, minor, by and through her guardian ad litem; Kelly Moe, minor, by and through the guardian ad litem, Plaintiffs–Appellants,

v.

United States of America, Defendant–Appellee.

Selma Jones, on her own behalf, Plaintiff,

and

Bryan Joseph (BJ) Hansen, a minor, by and through his guardian ad litem, Plaintiff–Appellant,

v.

United States of America, Defendant–Appellee.

Eva Irene Walch, Plaintiff–Appellant,

v.

United States of America,
Defendant–Appellee.

Tiffany Williams, individually and on behalf of Sean Williams and Hali Williams, her minor children, Plaintiffs–Appellants,

v.

United States of America,
Defendant–Appellee.

Ruth Gerken, Plaintiff–Appellant,

v.

United States of America,
Defendant–Appellee.

Sandee Wold, individually and on behalf of her minor children, Anthony Zucchetto and Janessa Zucchetto, Plaintiffs–Appellants,

v.

United States of America,
Defendant–Appellee.

Rande Lindner, as the duly appointed and qualified Personal Representative of the Estate of Anita Louise Lindner, deceased, for the benefit of Rande Lindner, Anastasia L. Lindner, Richard L. Lindner, Robert M. Lindner and Candice M. Lindner, Plaintiff–Appellant,

v.

United States of America,
Defendant–Appellee.

Samuel Alton Spencer, a minor by and through his guardian ad litem, Plaintiff–Appellant,

v.

United States of America,
Defendant–Appellee.

Selma Jones, Plaintiff–Appellant,

v.

United States of America,
Defendant–Appellee.

J. Arthur Zucchetto, Plaintiff–Appellant,

v.

United States of America,
Defendant–Appellee.

Gregory Paul McCarron, husband; Gregory Paul McCarron on behalf of Ryan William John McCarron, his minor child; as personal representative of the Estate of Christian Francis McCarron, deceased; Echo Ann McCarron, wife; Ryan William John McCarron, a minor child; Christian Francis McCarron, deceased, estate of, Plaintiffs–Appellants,

v.

United States of America,
Defendant–Appellee.

Heather Ford, a single woman, Plaintiff–Appellant,

v.

United States of America,
Defendant–Appellee.

Ledeana Kelley, wife; Shawn Kelley, husband; Rebecca Kelley, a minor, Plaintiffs–Appellants,

v.

United States of America,
Defendant–Appellee.

Ashley N. Williams, a minor, by and through her natural father and Guardian ad Litem, Sean Williams; Sean Tyler Williams, Guardian ad Litem, Plaintiffs–Appellants,

v.

United States of America,
Defendant–Appellee.

Michelle Renee Sigman, on her behalf and as Guardian Ad Litem for James Douglas Sigman, a minor, and as personal representative of Taylor McKenzie Sigman, deceased; James Douglas Sigman, a minor; Taylor McKenzie Sigman, deceased; Lorraine T. Murray, a single woman; Hazel Roberts, wife; Harold Roberts, husband; Pauline Brown; Marilyn Moe, on her behalf; Melissa Moe, minor, by and through her guardian ad litem; Kelly Moe, minor, by and through the guardian ad litem; Selma Jones, on her own behalf; and Bryan Joseph (BJ) Hansen, a minor, by and through his guardian ad litem; Eva Irene Walch; Tiffany Williams, individually and on behalf of Sean Williams and Hali Williams, her minor children; Ruth Gerken; Sandee Wold, individually and on behalf of her minor children; Rande Lindner, as the duly appointed and qualified Personal Representative of the Estate of Anita Louise Lindner, deceased, for the benefit of Rande Lindner, Anastasia L. Lindner, Richard L. Lindner, Robert M. Lindner and Candice M. Lindner; Samuel Alton Spencer, a minor by and through his guardian ad litem; Selma Jones; J. Arthur Zucchetto; Gregory Paul McCarron, husband; Gregory Paul McCarron on behalf of Ryan William John McCarron, his minor child; as personal representative of the Estate of Christian Francis McCarron, deceased; Echo Ann McCarron, wife; Ryan William John McCarron, a minor child; Christian Francis McCarron, deceased, estate of; Heather Ford, a single woman; Ledeana Kelley, wife; Shawn Kelley, husband; Rebecca Kelley, a minor; Ashley N. Williams, a minor, by and through her natural father and Guardian ad Litem, Sean Williams; Sean Tyler Williams, Guardian ad Litem, Plaintiffs–Appellants–Cross–Appellees,

v.

United States of America, Defendant–Appellee–Cross–Appellant.

Nos. 98–35913, 98–35922, 98–35935 to 98–35939, 98–35946 to 98–35948, 98–35950, 98–35951, 98–35960 to 98–35963, 98–35965 to 98–35967 and 98–36077.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 14, 1999

Filed March 29, 2000

Amended July 14, 2000

Michael T. Truscott, United States Department of Justice, Washington, D.C., for the defendant-appellee-cross-appellant.

Debra Stephens, Spokane, Washington, for the plaintiffs-appellants-cross-appellees.

Before: GOODWIN and SCHROEDER, Circuit Judges, and SCHWARZER,[1] Senior District Judge.

**ORDER**

The United States has filed a Petition for Rehearing and/or Clarification. Rehearing is not appropriate. The opinion filed on March 29, 2000 in this matter resolves only the jurisdictional issues raised by the government's invocation of sovereign immunity, and on remand, the government is not precluded from intro-

1. Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

ducing evidence to establish it complied with applicable standards and regulations.

The slip opinion filed March 29, 2000 is amended as follows:

Slip op. 3587 [208 F.3d 760], replace text of first full paragraph starting at line 12 with the following:

... must fail because the applicable regulations and internal directives denied the treating physician and reviewing officer the discretion to qualify Mellberg for enlistment without following up on Mellberg's admission of prior treatment for mental illness.

Slip op. 3592–3 [208 F.3d at 769–70], replace sentence starting at bottom of p. 3592 [208 F.3d at 772] with the following:

The regulations do not vest discretion in the MEB to recommend a return to duty if a member receives a non-worldwide qualified rating.

Slip op. 3594 [208 F.3d at 773], replace sentence starting at line 8 with the following:

The record fails to show that the mental health evaluation relied upon by the government to justify Mellberg's separation complied with a mandatory regulation.

The Petition for Rehearing and/or Clarification is otherwise DENIED.

## OPINION

SCHROEDER, Circuit Judge:

On June 20, 1994, less than one month after his honorable discharge from the United States Air Force, Dean Mellberg entered Fairchild Air Force Base near Spokane, Washington and opened fire, killing 4 people and wounding 23 others. The dead included two doctors who had months earlier diagnosed Mellberg as dangerous. The representatives of 19 of the victims filed these actions claiming the United States should be held liable on various theories of negligence for Mellberg's enlistment, for his subsequent retention in the Air Force despite bizarre behavior and unfavorable medical evaluations, and for his eventual honorable discharge into society without being given any serious medical or psychological treatment.

The government moved for summary judgment, claiming all of its challenged conduct was the product of military judgment and decision making protected by the "discretionary function" exception to the Federal Tort Claims Act (FTCA). *See* 28 U.S.C. § 2680(a). The plaintiffs responded that none of the challenged conduct was shielded by immunity under the FTCA. The district court granted the government's motion only in part and both sides appeal after certification for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

### Factual Background

Mellberg enlisted at a Military Entrance Processing Station (MEPS) in Lansing, Michigan in June of 1992. He filled out two medical evaluation forms. On the first, an Applicant Medical Prescreening Form, DD Form 2246, he answered that he had never been hospitalized, never had any broken bones, and had never been treated for any medical condition. On the other, a Report of Medical History, SF 93, he gave flatly contrary answers, indicating that he had been hospitalized, had suffered broken bones, and had been treated for a mental condition, describing the treatment as "family counseling" in December of 1986. Despite the conflicting answers and indications of prior physical and mental problems, Mellberg was permitted to enlist without further questions being asked. Neither the examining physician nor the senior officer, who was required by regulation to review the application, initiated any follow-up inquiries or investigation. This failure was arguably contrary to controlling regulations. *See* Army Regulation (AR) 40–501; Air Force Regulation (AFR) 33–3.

Mellberg reported for basic training to Lackland Air Force Base in Texas at the end of June 1992. Within three weeks of

arriving at Lackland, Mellberg was observed to be suffering from nervousness, excitability, low self-esteem, excessive sweating, and an inability to interact with fellow trainees. He was referred to Behavioral Analysis Services (BAS) at Wilford Hall, Lackland Air Force Base, for a mental evaluation, where he was diagnosed as having an Axis I "generalized anxiety disorder with strong obsessive traits." It was "strongly recommended" Mellberg be administratively separated from the Air Force immediately and referred to civilian mental healthcare upon discharge. Although this recommendation was forwarded to Mellberg's squadron commander, Mellberg was retained by the commander and returned to duty.

In August 1992, Mellberg reported for technical training to Lowry Air Force Base in Colorado. While at Lowry, Mellberg was referred for mental health evaluations on at least two occasions for threatening to set fire to his roommate and for staring at walls for extended periods of time. The records documenting these referrals are missing from Mellberg's medical records, possibly having been removed by Mellberg himself at a later date.

Mellberg joined the 92nd Maintenance Squadron at Fairchild Air Force Base in Washington in April 1993. On June 2, 1993, Mellberg's roommate complained that Mellberg was masturbating repeatedly in his presence and had exhibited violent and threatening tendencies. As a result, Mellberg was directed to undergo another mental health evaluation.

On June 14, 1993, psychologist Captain Alan London diagnosed Mellberg with a generalized personality disorder with strong obsessive-compulsive tendencies and recommended he be promptly separated from the Air Force. Mellberg's squadron commander decided not to discharge him, however, after speaking with Mellberg's parents and Mellberg himself.

After a public confrontation outside his roommate's work center on September 1, 1993, Mellberg underwent a follow-up mental evaluation. In an effort to resolve the conflict, Captain London and psychiatrist Major Thomas Brigham held a meeting with Mellberg, his roommate, and their first sergeant. Alarmed by their observations during the meeting, Drs. London and Brigham concluded that Mellberg was dangerous and arranged to have him admitted for psychiatric evaluation and treatment.

On September 9, 1993, Mellberg was admitted to the medical center at Lackland Air Force Base for evaluation by a medical evaluation board (MEB). Mellberg's first MEB diagnosed an Axis I anxiety disorder and a paranoid personality disorder. Subsequently, an informal physical evaluation board (PEB) gave Mellberg a 20 percent compensable disability rating due to his anxiety disorder, found him unfit for military duty, and recommended his discharge. Mellberg demanded a formal PEB evaluation, which was scheduled for December 8, 1993. That PEB was deferred after Mellberg's mother came to Texas and demanded an additional evaluation from a civilian psychiatrist.

On December 9, 1993, Dr. John J. Campbell submitted an addendum to Mellberg's MEB, downgrading the diagnosis to Axis II autism. Campbell noted that Mellberg had a "marked" impairment for military service and was "S4 non-worldwide qualified." On December 20, 1993, Mellberg's MEB paperwork was recalled from the PEB system and that disability proceeding was terminated.

A second MEB, held on January 4, 1994, and based on Campbell's addendum, resulted in a diagnosis of Axis II autistic disorder. The MEB recommended that Mellberg be discharged from the Air Force promptly, and suggested he be "return[ed] to duty for appropriate administrative disposition." On January 10, 1994, without apparent explanation, the Air Force Military Personnel Center validated Mellberg for return to duty.

Mellberg reported to Cannon Air Force Base in New Mexico on March 1, 1994.

On April 4, 1994, he was found riding a bicycle on the base's golf course and was detained by base security. Because he was uncooperative and unresponsive, Mellberg was taken to the hospital for a urinalysis. It was discovered that Mellberg had checked out his medical file on false pretenses. Some of the records were eventually found in Mellberg's room but the records related to his evaluations at Lowry Air Force Base were not with them.

On April 20, 1994, Mellberg was referred to still another commander-directed evaluation. He was diagnosed with autism and paranoid personality disorder by psychiatrist Captain Lisa Snow, who recommended discharge after reviewing a report prepared by a clinical psychologist, Tracy Dillinger, who had examined Mellberg. The Cannon Air Force Base commander adopted this recommendation, and on May 11, 1994, notified Mellberg of her intent to discharge him for conditions that interfere with military service.

Mellberg was honorably discharged pursuant to AFR 39–10 on May 23, 1994, and was given 60 days of medical care to be performed at his option and two years of base exchange and commissary privileges. After being observed on the base at odd hours, Mellberg was barred from entering Cannon Air Force Base (except for medical treatment, and only if accompanied by military police) on May 25, 1994. Cannon did not notify or warn Fairchild Air Force Base or any other base where Mellberg had been stationed.

Mellberg then traveled to Lackland Air Force Base and visited a psychiatrist who had treated him previously. Thereafter, he flew to Elmendorf Air Force Base in Alaska, apparently in search of Drs. London and Brigham. A week later, Mellberg returned to Washington and purchased a semiautomatic rifle and 75–round magazine.

On June 20, 1994, Mellberg arrived at Fairchild Air Force Base by taxicab, unimpeded by base security. He entered the Fairchild Medical Treatment Facility, sought and killed Drs. London and Brigham, and fired numerous gunshots throughout the complex. He was killed by a military policeman after killing four people and wounding 23 others.

### Proceedings Below

The district court evaluated each of the plaintiffs' negligence claims to determine the applicability of the discretionary function exception, ultimately concluding that the exception barred all of the plaintiffs' claims except for the "negligent enlistment" and "medical malpractice" claims. It entered judgment as to the barred claims and certified the case for immediate review under 28 U.S.C. § 1292(b), noting that the applicability of the discretionary function exception to each of the claims represented a controlling issue of law. We agreed and granted permission for interlocutory appeal. This appeal by the government and cross-appeal by plaintiffs followed.

### The Federal Tort Claims Act

■ Suits against the United States and its agencies are barred by sovereign immunity unless permitted by an explicit waiver of immunity from suit. *See FDIC v. Meyer,* 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). Congress waived the United States' immunity from suits for money damages for traditional tort claims when it passed the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671–2680, which provides that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. This broad waiver of immunity is subject to various limitations.

Only one exception is at issue in this case-the "discretionary function" exception codified at 28 U.S.C. § 2680(a). That section provides that the FTCA's provisions shall not apply to:

Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). The discretionary function exception is designed to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort." *United States v. Gaubert*, 499 U.S. 315, 323, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). The Supreme Court has also admonished that "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *United States v. Varig Airlines*, 467 U.S. 797, 813, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

To determine whether the discretionary function exception is applicable, courts typically determine first whether the challenged action involves an element of choice or judgment. *See Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). The exception does not apply when "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id.* Second, assuming an action does involve an element of choice or judgment, courts must decide whether that choice or judgment is of the type that Congress intended the discretionary function exception to shield. *Id.* Only those exercises of judgment which involve considerations of social, economic, and political policy are excepted from the FTCA by the discretionary function doctrine. *See Varig Airlines*, 467 U.S. at 814, 104 S.Ct. 2755. The United States has the burden of proving that the discretionary function exception applies. *See Prescott v. United States*, 973 F.2d 696, 702 (9th Cir.1992). In cases in which the exception does apply, the court lacks subject matter jurisdiction over the action. *See Lesoeur v. United States*, 21 F.3d 965, 967 (9th Cir.1994); *Sabow v. United States*, 93 F.3d 1445, 1451 (9th Cir.1996).

### *Mellberg's Enlistment*

At the time of his enlistment, Mellberg completed Form SF 93, a Report of Medical History. On the form, Mellberg answered that he had been treated for a mental condition, describing the treatment as "family counseling" some five years earlier. The issue that divides the parties here is whether government regulations required it to obtain follow-up information or whether, as the government maintains, there were no regulations regarding further exploration by the examining physician or the reviewing officer once prior physical or mental illnesses were disclosed. It is undisputed that neither the examining physician nor the senior liaison non-commissioned officer required by regulation to review the report, *see* AFR 33–3, did any followup questioning about the mental illness. Mellberg was thus permitted to enlist in the Air Force without the Air Force having obtained any information as to the nature of his prior mental illness or medical treatment for it.

The district court held that Army Regulation (AR) 40–501 applied to the enlistment. It is undisputed that Chapter 8 of that voluminous regulation, pertaining to various standards of medical fitness, requires that the examining physician at enlistment obtain clarification and a full description whenever the prospective enlistee responded affirmatively to any of the questions regarding existence of prior treatment for a physical or mental condition.

The physician will summarize and elaborate upon the examinee's medical history as revealed in items 8 through 24 ... cross-referencing his or her comments by item number. All items checked in the affirmative will be clarified and the

examiner will fully describe all abnormalities including those of a nondisqualifying nature. This information is needed to assist in evaluating the examinee's background and to protect the individual and the government in the event of future claims for disability or aggravation of disability.

AR 40–501, Chapter 8–14(d)(1).

The government maintains that Chapter 8 of AR 40–501 did not apply to Mellberg's enlistment because it occurred at a Military Entrance Processing Station (MEPS). For that reason, the government argues, the court should have looked only to AFR 33–7, a regulation that generally pertains to the operation of a MEPS, and Chapter 8 of that regulation, which relates to the medical examination. Chapter 8 of AFR 33–7 expressly incorporates the medical fitness standards for enlistment in AR 40–501, Chapter 2. The Air Force stresses that the Air Force MEPS regulation does not expressly incorporate the requirements of AR 40–501, Chapter 8. It urges us to conclude that there were therefore no applicable controlling procedures. According to the government, the manner in which the examination was conducted, no matter how negligent, was committed by Air Force policy to the discretion of the examining physician and reviewing officer.

It is hard for us to believe the Air Force would adopt standards for medical fitness, but refuse to adopt procedures for implementing the standards. Nor is that position supported by the record. Mellberg's examination was conducted by using the very SF 93 form prescribed in AR 40–501, Chapter 8. The form itself calls for follow-up in the event of an affirmative answer to the question about prior treatment of a mental condition. AFR 33–7, relied on by the government, does expressly refer to Chapter 10 of AR 40–501; Chapter 10, entitled "Medical Examination Techniques," prescribes, inter alia, the procedures to be followed for a full medical examination. It assumes the completion of a Form SF 93 relating to a psychiatric

interview by stating, "The psychiatric interview will be conducted subsequent to the completion of all items on SF 88 and 93." Therefore applicable regulations appear to support plaintiffs' position that when the Air Force in Mellberg's enlistment examination failed to follow up on his prior treatment for a mental condition, the Air Force violated mandated procedures.

The government also contends that the district court erred when it did not defer to a particular declaration by the Medical Standards Officer of the United States Military Entrance Processing Command, Dr. Charles Arrants. His declaration stated that in 1992 there were no regulations or guidelines specifically addressing what action should be taken when a MEPS examining physician confronts an enlistment candidate who reports a history of family counseling. The government asks us to rely on this declaration as an authoritative agency interpretation of its own regulations. *See, e.g., City and County of San Francisco v. United States,* 130 F.3d 873, 877 (9th Cir.1997).

This affidavit appears to have been prepared for this litigation and does not appear to have been followed by the agency itself. The district court cited subsequent memoranda written by Dr. Arrants and a colleague that conflicted with Dr. Arrants' declaration. In an August 10, 1994, memorandum to MEPS commanders, intended "to reemphasize proper procedure for evaluation of applicants with a history of past psychiatric treatment," Dr. Arrants advised that where prior counseling is disclosed, the actual counseling records must be obtained:

> Whenever *any* psychiatric/counseling history is noted, the MEPS physician *must* obtain all relevant civilian medical counseling records in order to evaluate the actual nature of the problem. If those records reveal that a disqualifying condition existed in the past, the applicant must be found disqualified regardless of his or her present state. (Emphasis in original).

This advice was echoed in a followup memo by a subordinate, Colonel Wanda Wood, which stated again that the "long-standing policy on psychiatric history ... has been to require review of civilian medical health records for all positive history" and "to include any counseling of a mental health nature." These memoranda prepared for agency use are more persuasive than the declaration of Dr. Arrants prepared for litigation.

Also at enlistment, the senior liaison non-commissioned officer was required to review Mellberg's enlistment forms for disqualifying or questionable information, and to resolve questionable information before continuing Mellberg's enlistment. *See* ATCR 33–2, § 1–3(b)(4). His review was not committed to unbridled discretion either. He was required to see that full disclosures were made.

■ We therefore affirm the district court's holding that plaintiffs are entitled to proceed on their claim that the government negligently processed Mellberg's enlistment by failing to undertake further mental or psychiatric review that would have disclosed the existence of a serious mental condition. The government's threshold claim of sovereign immunity on the ground of discretionary function must fail because the applicable regulations and internal directives denied the treating physician and reviewing officer the discretion to qualify Mellberg for enlistment without following up on Mellberg's admission of prior treatment for mental illness.

### Subsequent Failures to Diagnose and Treat Mellberg for Serious Mental Disorders

■ Plaintiffs raise various claims under the FTCA for subsequent failures to diagnose, treat, and control Mellberg, despite repeated referrals to physicians for evaluations. The district court denied the government's motion to dismiss these claims on immunity grounds, holding that they amounted to claims of medical malpractice, and were therefore not covered

by the discretionary function exception. It relied upon *Fang v. United States,* 140 F.3d 1238 (9th Cir.1998); *Lather v. Beadle County,* 879 F.2d 365 (8th Cir.1989); and *Collazo v. United States,* 850 F.2d 1 (1st Cir.1988). These cases are all examples of the now well-established principle that the discretionary function exception is intended to shield the government from liability for the exercise of governmental discretion, not to shield the government from claims of garden-variety medical malpractice.

The government argues that because the Air Force psychiatrists and psychologists who evaluated Mellberg were in each instance carrying out a directive ordered by a commander who was concerned less about Mellberg's well-being than his fitness to serve in the military, the physicians were performing a discretionary policy-based function and are shielded from liability under the FTCA. It relies on *Foster v. United States,* 923 F.2d 765 (9th Cir.1991), in which we held that the alleged negligence of an FAA physician in issuing a medical certificate for a commercial pilot, who later had a heart attack during flight, was within the discretionary function exception.

*Foster,* and other cases upon which the government relies, however, involve the evaluation of individuals or programs for specialized governmental requirements, such as the FAA certification requirements at issue in *Foster. See* 14 C.F.R. §§ 61.3(c) *et seq.* Analogously, in *In re Consolidated U.S. Atmospheric Testing Litigation,* 820 F.2d 982, 993–95 (9th Cir. 1987), we considered claims for radiation injuries resulting from the Department of Defense's atomic weapon testing program, and held they fell within the exception. In *General Dynamics Corp. v. United States,* 139 F.3d 1280 (9th Cir.1998), we dealt with prosecutorial discretion, an inherently governmental function.

In this case, by contrast, the claim is for negligence in performing a function that is

analogous to functions performed by professionals in the private sphere every day: the diagnosis and treatment of mentally ill individuals. The governmental discretion exception should not apply.

The distinction we draw is not new, although this is the first case of which we are aware involving mental fitness examinations of members of the military. It exemplifies the distinction between the exercise of governmental discretion and non-governmental discretion. Professor Davis summarized it cogently:

> The discretionary function exception is limited to the exercise of governmental discretion and does not apply to the exercise of nongovernmental discretion such as professional or occupational discretion. The driver of a mail truck makes many discretionary decisions but they are not within the exception because they involve driving discretion, not governmental discretion. The physician at the veterans' hospital exercises professional discretion in deciding whether or not to operate; ... he combines professional discretion with governmental discretion when he decides that budgetary restrictions require nonuse of an especially expensive treatment in absence of specified conditions.

K. Davis, *Administrative Law Treatise* § 25.08 at 403–04 (Supp.1982).

We drew this distinction quite explicitly in *Fang*, where plaintiff challenged the medical treatment administered at the remote scene of an automobile crash in a national park. *See Fang*, 140 F.3d 1238. We held that the government exercised a discretionary function when it decided the amount and quality of medical equipment it needed to maintain to respond to accidents in infrequently visited areas of the park. *See id.* at 1243. Once emergency technicians arrived at the scene, however, the manner in which they conducted ordinary medical procedures, such as administering splints and transporting the patient, had nothing to do with policy considerations and hence were not immune. *Id.* at 1242. "[T]he United States is not immune from claims which challenge the actual administration of medical care by its employees when the claims do not concern actions which are the product of judgment driven by the consideration of competing policy-based choices." *Id.* at 1241–42.

In this case, plaintiffs' claims arising out of the failure of Air Force physicians to properly diagnose Mellberg's condition do not involve any competing policy considerations. They involve performance of duties by professionals both inside and outside the military. They do not relate to any special functions reserved to governmental policy and expertise and exempted from the FTCA's waiver of immunity. The district court correctly held the claims should proceed.

### Failure to Warn Employees of Fairchild Air Force Base

The district court dismissed plaintiffs' claims that the Air Force was negligent in failing to warn medical personnel at Fairchild Air Force Base of Mellberg's release from the military. The plaintiffs contend that the court erred by relying upon cases involving the application of allegedly mandatory directives to issue warnings of potential hazards in national parks. *See, e.g., Blackburn v. United States*, 100 F.3d 1426 (9th Cir.1996); *Valdez v. United States*, 56 F.3d 1177 (9th Cir.1995); *Childers v. United States*, 40 F.3d 973 (9th Cir.1994). The plaintiffs suggest that the court should have found this case analogous to an ordinary state law negligence claim not involving the exercise of discretionary, policy-based decisionmaking. *See Jablonski v. United States*, 712 F.2d 391 (9th Cir.1983) (doctors' failure to warn mental patient's girlfriend, who was later killed, of patient's dangerousness not discretionary function), *overruled on other grounds, Matter of McLinn*, 739 F.2d 1395 (9th Cir.1984).

This case, however, unlike *Jablonski*, does not involve a failure to warn about

any easily foreseeable physical hazard to particular individuals. The danger in this case was not so easily predictable, and the risks of causing unfounded alarm were real. In addition, Mellberg's own privacy interests had to be taken into account. We agree with the district court that the Air Force's decision not to warn Fairchild Air Force Base of Mellberg's release, though ill advised, brought into play sensitive and competing policy considerations of protecting safety while preserving resources and preventing unwarranted alarm for military employees.

### Base Security at Fairchild

 The district court also properly rejected plaintiffs' claims that the security measures in place at Fairchild Air Force Base were negligently inadequate. Decisions by base commanders regarding base security involve discretion and the balancing of numerous policy considerations. *See, e.g., Goldstar (Panama) S.A. v. United States,* 967 F.2d 965, 970 (4th Cir.1992); *cf. United States v. Albertini,* 783 F.2d 1484, 1487 (9th Cir.1986).

· Plaintiffs argue that Fairchild was in violation of "mandatory minimum" controls set forth in AFR 125–37. These included perimeter fencing around Air Force installations, the posting of warning signs, and barring taxis unless the personnel transported possessed DOD credentials. The medical facility was not within the fenced and gated area, and Mellberg arrived there by taxi without credentials.

There is no regulation, however, that requires a medical facility to be within the fenced installation. From this record it does not appear that the medical facility at Fairchild Air Force Base was considered part of the "installation" for purposes of AFR 125–37. Air Force regulations are extremely deferential in granting the base commander discretion regarding security:

> The installation commander, with the advice of the RPEC, determines the degree of control required over personnel entering or leaving the base.... [The

base commander,] in determining the stringency of the controls [over base entry] used, must consider the local environment; the security priority of assigned resources (AFR 207–1); the threat to the base; pilferage problems; and base features that might present significant hazards to public safety.

AFR 125–37, 6–2.

Finally, a regulation specific to Air Force medical facilities provides that such facilities are unique and that standard protection principles must be adapted to fit the needs of the specific unit, as they must be open 24 hours a day "with an entire cross-section of military and non-military personnel flowing in and out at various times." AFR 125–37, 12–2c. The decision to locate the medical installation outside the area subject to more intensive security requirements was consistent with these considerations. The plaintiffs' claims of negligent security at Fairchild Air Force Base are therefore barred by the discretionary function exception to the FTCA.

### Mellberg's Return to Duty with a "Non–Worldwide Qualified" Rating & Eventual Discharge

The facts surrounding Mellberg's treatment at Lackland and Cannon Air Force Bases and his eventual honorable discharge without medical treatment are rather confused. They appear to form the basis of at least three claims (apart from claims of medical malpractice) that present sufficient allegations that the government violated applicable regulations to survive the government's motion to dismiss.

 At Lackland, Mellberg had a Medical Evaluation Board (MEB) evaluation that resulted in his being rated "nonworldwide qualified," yet he was retained on active duty. Plaintiffs claim the applicable regulation, AFR 168–4, was violated because it provides that a patient cannot be returned to duty unless the patient is medically qualified for "world-wide military service." AFR 168–4, Chapter 13–22.

Also, AFR 168–4, Chapter 13–32 provides that a medical treatment facility must communicate a member's medical status and duty limitations when returning an Air Force member to duty following an MEB examination.[2] The regulations do not vest discretion in the MEB to recommend a return to duty if a member receives a non-worldwide qualified rating. *See* AFR 168–4, Ch. 13–22. Hence the government cannot rely on the discretionary function exception to defeat plaintiffs' claim that the government negligently violated this mandatory duty.

■ Similarly, plaintiffs claim that Lackland's medical facility was negligent in failing to complete an AF Form 422, an evaluation used in connection with the MEB. This claim should not have been dismissed. Such a form is required by AFR 168–4, Chapter 13–32 ("The servicing medical treatment facility *must* provide a proper AF Form 422 . . .") (emphasis added).

■ Once transferred to Cannon Air Force Base in March 1994, Mellberg's bizarre behavior once again prompted his referral for a mental health examination. An exam conducted in connection with his subsequent discharge proceedings resulted in Mellberg being found "world-wide qualified," and hence eligible for release without medical restriction. Plaintiffs contend that Mellberg's release should have been pursuant to AFR 168–4, Chapter 12–98, an outprocessing provision that requires adequate provision for medical care on release.[3]

According to the plaintiffs, Mellberg could not properly have been discharged pursuant to AFR 39–10, 5–11(i)(1), because his recommendation for discharge was not "supported by a report of evaluation by a board certified psychiatrist or clinical psychologist" which "state[d] the disorder is so severe that the member's ability to function effectively in the military environment is significantly impaired," as required by AFR 39–10, 5–11. We agree. The record fails to show that the mental health evaluation relied upon by the government to justify Mellberg's separation complied with a mandatory regulation. Mellberg was examined by Captain Lisa Snow, a psychiatrist. Snow's May 5, 1994, memorandum was relied upon in the letter notifying Mellberg of his discharge from the Air Force. However, Snow was not board certified at the time of Mellberg's evaluation, as mandated by AFR 39–10, 5–11, and her evaluation was not sufficient to support the government's discharge of Mellberg under AFR 39–10. Because the duty alleged to have been violated is mandatory, the Air Force is not entitled to immunity from challenges to Mellberg's discharge under the discretionary function exception.

### *Conclusion*

The district court's dismissal of plaintiffs' claims involving alleged violations of mandatory regulations in connection with Mellberg's return to duty with a "non-worldwide qualified" rating and his honor-

2. AFR 168–4, Chapter 13–32 provides in part: Physical Profile After MEB. The servicing medical treatment facility must provide a proper AF Form 422 for members returned to duty following MEB action. . . . AF Form 422 is a means for medical authority to communicate a member's medical status and duty limitations to the member's commander, servicing CBPO and other nonmedical agencies.

3. AFR 168–4, Chapter 12–98 provides in part:
 a. A patient who does not exhibit suicidal or homicidal tendencies may be released

to the custody of the next of kin (at the patient's request). . . .
 b. A patient who exhibits suicidal or homicidal tendencies is disposed of as follows: (1) A member or former member of the Armed Forces who is entitled to treatment by the VA is:
 (A) Moved to a hospital designated by the VA.
 (B) Delivered to an acceptable state, municipal, or civilian hospital. This requires the request of the next of kin and authorization for admission from the hospital concerned.

able discharge is reversed, and those claims are remanded to the district court. The district court's decision, dismissing the remaining claims except those arising out of Mellberg's enlistment and alleged medical malpractice by Air Force doctors, is otherwise affirmed. We express no opinion on the merits of any of plaintiffs' claims, which we return to the district court for further proceedings. We hold only that they are not barred by sovereign immunity.

AFFIRMED IN PART AND REVERSED IN PART. Each party to bear its own costs.