231 F.3d 501 (9th Cir. 2000)
 DANIEL REED, by and through his conservator, JOLAINE ALLEN, Plaintiffs-Appellants,
and
PERSHING COUNTY; PERSHING CO. SHERIFF; WASHOE COUNTY; WASHOE COUNTY SHERIFF; AVIS RENT-ACAR; LARRY DEAN HUDSON; LARRY DEAN MEYER; LARRY D. HARVEY, Individually dba: Burning Man Project; JOHN LAW, Individually dba: Burning Man Project; dba: Burning Man; MICHAEL MIKEL, Individually dba: Burning Man Project; dba: Burning Man; FELLINI, CRONENBURG AND DANTE;
BLACK ROCK SECURITY GROUP; BLACK ROCK RANGERS, Defendants,
v.
UNITED STATES DEPARTMENT OF THE INTERIOR, Bureau of Land Management, Defendant-Appellee.
 No. 99-15250
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted May 3, 2000
Filed November 2, 2000
 
 Michael M. Shea, Shea & Shea, San Jose, California, for plaintiff/appellant Daniel Reed, by and through his Conservator, Jolaine Allen.
 Robert S. Mueller, III, and Gail Killefer and Yonkel Goldstein, United States Attorney's Office, San Jose, California, for defendant-appellee United States of America.
 Appeal from the United States District Court for the Northern District of California Spencer Williams, District Judge, Presiding. D.C. No. CV-97-20760 SW
 Harlington Wood, Jr.,[1] Andrew J. Kleinfeld, and Susan P. Graber, Circuit Judges.
 WOOD, Circuit Judge:
 
 
 1
 Plaintiff-appellant Daniel Reed was severely injured in the early morning hours of September 2, 1996, when a car ran over the tent in which he was sleeping. At the time of the accident, Reed was attending an event known as the Burning Man Festival, which was held on the desolate Black Rock Desert playa[2] in Nevada. The playa is federally owned land managed by the Bureau of Land Management ("BLM"). Reed filed suit under the Federal Tort Claims Act, 28 U.S.C. SS 2679-2680 ("FTCA"), against the United States to recover damages for his injuries. The United States moved for summary judgment, asserting that the suit was barred by the discretionary function exception to the FTCA, 28 U.S.C.S 2680(a). The district court granted summary judgment in favor of the United States, ruling that all the allegedly negligent conduct of the government was shielded by the discretionary function exception of the FTCA, leaving the court without subject matter jurisdiction. Reed appeals. We review de novo. Miller v. United States, 163 F.3d 591, 593 (9th Cir. 1998).
 
 
 2
 It may be helpful in viewing plaintiff's injuries in context to explain the Burning Man event. According to its promoters, the event began on a beach in San Francisco in 1986, but in 1990 was moved to the "vast and oceanic space " of the Black Rock Desert of Nevada near Gerlach.[3] The San Francisco Examiner described the event as "based loosely on European pagan straw man festivals at which people gather to erect and burn a large human effigy as dedication to the earth's fertility."[4] The Journal of the Burning Man describes the event as "ritualistic . . . anarchic . . . primal . . . a radical communal experiment . . . art . . . the death of art . . . dream-like . . . surreal . . . creative . . . destructive . . . absurd . . . spiritual" and "real." The Journal tells us:
 
 
 3
 Think of Burning Man as Disneyland turned inside out. But unlike an escapist fantasy produced by others, Burning Man is not vicarious. At Burning Man you are the fantasy. People do not come to this event to be distracted from themselves, they come here to discover and distill what they uniquely are. We will not tell you what it means, for Burning Man is based on your immediate experience.
 
 
 4
 (Emphasis in original.) The Journal advises attendees to "[c]ome prepared to camp here and confront your own survival." In answer to the question, "What is Burning Man?", the Journal states, "It's what you make it." Participants enter the event through the "Gate of Hell" on which is inscribed the admonition, "ABANDON HOPE YOU WHO ENTER HERE."[5] The Burning Man 1996 Survival Guide handout warns: "All participants must take personal responsibility for their own survival, safety and comfort" and cautions participants to bring common sense as "the desert is notoriously unkind to fools." The Survival Guide also warns that "[t]here are no roads, signs or street lights" on the playa. The Pershing County Sheriff's Office issued a report on the 1996 festival, estimating that participants numbered approximately 7,000, with an additional 3,000 to 4,000 onlookers.[6]
 
 
 5
 Reed, age 21, from Campbell, California, was attracted to the event for his own reasons. He apparently was accompanied by a friend from Santa Rosa, California (who was also injured but is not involved in this litigation). Reed pitched his tent near a few other tents on the playa several miles from the main camp. September 1, 1996, appears to be the day the event concluded, although the following day was designated as "clean-up day." Early on the morning of September 2, the car of another attendee, traveling across the playa, ran over Reed in his tent. Reed alleges that he suffered severe, permanent brain damage and was left permanently disabled. This action resulted.
 
 ANALYSIS
 
 6
 The district judge carefully analyzed the legal situation and, on December 10, 1998, granted the government's motion for summary judgment due to the fact that, under the applicable statutes, the district court lacked subject matter jurisdiction. We agree. The United States can be sued only to the extent that it has waived its sovereign immunity. Blackburn v. United States, 100 F.3d 1426, 1429 (9th Cir. 1999). The FTCA, however, "waives the Government's sovereign immunity for tort claims arising out of the negligent conduct of government employees acting within the scope of their employment." Id. (citation omitted). Consequently, the government can be sued and may be liable "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. S1346(b). However, that waiver of immunity is then limited by the "discretionary function" exception, 28 U.S.C. S 2680(a), which is applicable to this case.
 
 
 7
 The discretionary function exception limits the FTCA's otherwise broad waiver of sovereign immunity, stating that the provisions of the FTCA shall not apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C.S 2680(a). In United States v. S. A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 813-14 (1984), the Supreme Court established a two-part test for use in determining whether the discretionary function exception applies. See also Berkovitz v. United States, 486 U.S. 531, 536-37 (1988). First, a court must determine whether the challenged action involves an element of choice or judgment. Varig Airlines, 467 U.S. at 813. If it does, then secondly, the court must decide "whether that judgment is of the kind that the discretionary function exception was designed to shield, " which "protects only governmental actions and decisions based on considerations of public policy." Berkovitz , 486 U.S. at 53637 (citation omitted). If both tests are satisfied, the discretionary function exception applies, leaving the court without subject matter jurisdiction. Sigman v. United States, 217 F.3d 785, 793 (9th Cir. 2000). The United States bears the burden of proving that the exception applies. See id.
 
 
 8
 Reed contends that the following four actions by the BLMfall outside the scope of the discretionary function exception: (1) failing to warn, or to require Burning Man organizers to warn, of the hazard of camping in an area subject to unrestricted night-time vehicular travel; (2) approving a site plan that failed to segregate cars from tents; (3) failing to monitor the event as prescribed by regulation and policy; and (4) failing to suspend the permit once public safety was in jeopardy.
 
 
 9
 With respect to the first two challenged actions, the first prong of the discretionary function test clearly is met. The BLM was granted discretion to determine whether to issue the permit or not and, if issued, to decide the restrictions to be applied. The agency is given specific authority to include in a recreation permit "such stipulations as the authorized officer considers necessary to protect the lands and resources involved and the public interest in general." 43 C.F.R. S 8372.5(b). As a practical matter, it could be no other way than by the exercise of discretion. No federal statute, regulation, or policy requires a particular course of action. See United States v. Gaubert, 499 U.S. 315, 322 (1991). Even if the permit had been granted without any conscious policy decision (contrary to the facts of this case), the discretionary exception function would still apply. See Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1028 (9th Cir. 1989); Myslakowski v. United States, 806 F.2d 94, 97-98 (6th Cir. 1986). The BLM, in its exercise of discretion, balanced competing public policy concerns, including concerns about public access, safety, resource allocation, and the environment, as allowed under both Gaubert and Varig. Gaubert, 499 U.S. at 324; Varig, 467 U.S. at 820.
 
 
 10
 The record reveals that the government exercised its discretion in granting Burning Man the event permit. Even if the exercise of that governmental discretion was ill-advised, it does not make the discretionary function exception inapplicable. Even if the particular provisions included in the permit itself were not well-conceived or sufficient, that exercise of discretion is also beyond Reed's reach. After the BLM received the event application from Larry Harvey, Burning Man's promoter, the agency began its preliminary process of review. It sent out letters to interested parties in compliance with the National Environmental Policy Act of 1969, 42 U.S.C. SS 4321-4370 ("NEPA"), seeking comments related to the proposed event. The comments received expressed concerns about safety, morality, and the environmental impact of the event. Following consideration of those comments, the BLM prepared an Environmental Assessment, which considered the possible impact of the event on the environment, but found that there would be no significant environmental impact. It noted that the area to be used was believed to be one of the largest, flattest dry lake beds in the world.[7] In its judgment, BLM considered that the Burning Man event had had no prior significant safety problems from 1992 through 1995. Even though the event was growing in size each year, the record shows that it also had a good compliance record with BLM licensing requirements. As part of the process, the promoters were required to submit a "site plan " with some indication of the physical layout for the event, bearing in mind the openness, vastness, and flatness of the area. The BLM reviewed the site plan submitted and, in its discretion, considered it adequate for the short-term recreational event.
 
 
 11
 The BLM also considered Congressional directives, as stated in the Federal Land Policy and Management Act of 1976, 43 U.S.C. SS 1701-1784 ("FLPMA"), to manage the land for multiple uses in a manner that would help meet the present and future needs of the citizens, including recreational uses. 43 U.S.C. SS 1732(a), 1701(a)(2), (7), 1702(c). According to a BLM district manager, the government land use plan in effect at the time Burning Man applied for its 1996 permit dictated that "as many recreational opportunities as possible" be provided, "without undue environmental degradation." And, of course, under the Constitution's First Amendment, the agency's discretion could not be used to abridge the legitimate rights of expression or association of the participants. The BLM was aware that many event participants pursued and encouraged an "alternative lifestyle," but it believed that the actions taken in the exercise of its discretion should not be affected by the personal philosophies of the participants. The BLM believed that the proposed policing strategies would be sufficient to handle any illegal activity that might occur. According to the record, there had been some use of alcohol and illegal drugs in the past but, in the BLM's judgment, there had been no serious problems. The provisions for policing were expected to be adequate. The BLM also took into consideration planned coordination with local law enforcement officials, in addition to the event's own acceptance of responsibility for the safety of its participants. There is no need to further explore all the details involved in the BLM's exercise of its discretion. Some would disagree with the manner of the agency's exercise of its discretion, but that is irrelevant.
 
 
 12
 Reed argues that, even though the BLM may have had discretion to issue the permit, "the decision to approve an event involving thousands of campers and cars without segregating them, or requiring Burning Man to do so, was not the kind protected by the discretionary jurisdiction exception, it violated standard, elementary objective, technical standards for events of this size." Reed is mistaken. This issue is the type of judgment the discretionary function exception was designed to shield. Gaubert, 499 U.S. at 323. In his brief, Reed maintains:
 
 
 13
 The failure to warn campers, and the failure to require Burning Man to warn campers, is not pro tected by the discretionary function. This failure is "garden-variety" negligence which does not implicate significant, unusual or unique social, economic, and political considerations. As the event doubled its expected size and the BLM's agents became aware of the increased danger to the safety of the participants, their failure to warn campers, or failure to ask Burning Man to warn (or separate cars and campers) was not of the type protected by the discretionary function exception. Moreover, the BLM failed in its mandatory duty to both monitor the event and pro tect the public by temporarily suspending the permit while taking appropriate remedial action.
 
 
 14
 Reed's arguments do not overcome the presence of a discretionary function. No degrees of negligence are involved. There was one discretionary license issued for this event, and what its terms were and how those terms might be enforced were all discretionary. Reed's own argument shows the need for agency discretion. He disagrees with the way discretion was exercised, but the discretionary function exception makes that objection irrelevant.
 
 
 15
 Reed next argues that the BLM was required by regulation and policy to monitor the event and that its failure to do so falls outside the discretionary function exception. Under 43 C.F.R. S 2920.9-2, the BLM was required to "inspect and monitor . . . to assure compliance with the plan of management and protection of the resources, the environment and the public health, safety and welfare." Although Reed asserts that BLM agents chose not to monitor the event, in fact, they did monitor it. Rather, his real argument is that, because the agents left the site by 10:00 p.m. each evening, the agents failed to monitor in a reasonable manner. However, as was the case in Childers v. United States, 40 F.3d 973, 976 (9th Cir. 1994), the discretionary decisions made as to the precise manner in which the BLM should monitor events also fall within the exception. See also Blackburn, 100 F.3d at 1431. No regulation required twenty-four hour monitoring; in fact, the BLM Manual H-8372-1-Special Recreation Permit for Commercial Use, VIIA, states that the amount of monitoring should be "commensurate with the resource values at risk, the permittee's past record of compliance, the ability to obtain monitoring services through other means such as local police, other permittees, the public, and other factors." The decision as tothe nature and extent of monitoring clearly involves both discretion on the part of BLM employees and a balancing of public policy concerns.
 
 
 16
 Finally, Reed contends the BLM had a duty to suspend the permit once public safety was in jeopardy, but failed to do so. Under 43 C.F.R. S 2920.9-3,
 
 
 17
 (a) Land use authorizations may be terminated under the following circumstances:
 
 
 18
 . . . .
 
 
 19
 (2) Noncompliance with applicable law, regula tions or terms and conditions of the land use authori zation.
 
 
 20
 . . . .
 
 
 21
 (b)(1) Upon determination that there is noncompli ance with the terms and conditions of a land use authorization which adversely affects the public health, safety or welfare or the environment, the authorized officer shall issue an immediate tempo rary suspension.[8]
 
 
 22
 The BLM Manual, H-8372-1, VIIC, provides: "Permits shall be immediately suspended, and other appropriate penalties imposed, for violations of Federal, State, or local laws, regulations, or permit stipulations providing for the safety or health of the public." Reed contends that Burning Man organizers violated their permit obligation to protect the safety of the public and, therefore, the BLM was obligated to suspend the permit. Although Reed asserts, without citation to the record, that "the BLM knew that Burning Man had created a situation violating their permit obligation to protect the safety of the public," there is no evidence in the record that, during the course of the 1996 festival, the BLM determined a permit violation affecting the public health or safety had occurred. In his reply brief, Reed concedes that the determination as to whether a violation affects public health or safety implies choice, Myers v. United States, 17 F.3d 890, 895-96 (6th Cir. 1994), but argues that the determination made by "line-level employees at the event" does not implicate public policy concerns. However, nothing specifies which agency employees may or may not exercise discretion. Both the regulations and the BLM Manual require not only a finding of a violation, but also a finding that the violation affects public health or safety. There were no set standards in place outlining what types of permit violations would be sufficient to justify permit suspension; the BLM Manual, H-8372-1, VIIC, states only that "[a]n example could be the lack of a required local license for food service." The decision to suspend the permit would necessarily include a discretionary balancing of policy considerations. National Union Fire Ins. v. United States, 115 F.3d 1415, 1421 (9th Cir. 1997). Therefore, again, the discretionary function exception applies.
 
 
 23
 Reed cites a number of cases, including Faber v. United States, 56 F.3d 1122 (9th Cir. 1995), and Routh v. United States, 941 F.2d 853 (9th Cir. 1991), to illustrate why the discretionary function exception should not be extended to the present circumstances. Those cases are inapposite because they involve allegations of isolated instances of negligence that were not policy-based, as were the discretionary decisions in this case. See Faber, 56 F.3d at 1127; Routh, 941 F.2d at 857. Reed also cites Appley Bros. v. United States, 164 F.3d 1164 (8th Cir. 1999), to show that the BLM violated its duty. However, in Appley, the government regulation mandated a particular government action. Id. at 1173. In the present case, the regulation does not mandate any particular act which the government failed to perform. Possible suspension of the permit was left to the discretion of the agency. In its exercise of discretion, the BLM also considered that revocation of the license in the circumstances of this event, with so many people spread over a wide area, would likely cause confusion and serious dangers.
 
 
 24
 Reed cites Seyler v. United States, 832 F.2d 120, 122-23 (9th Cir. 1987), in arguing that the failure to provide warning signs is not a policy-based decision. Seyler is distinguishable from the present case. The panel in Seyler noted: "We can find nothing in the record to suggest that the BIA's failure to provide signs resulted from a decision `grounded in social, economic or political policy.' " Id. at 123 (quoting Varig Air-lines, 467 U.S. at 814). Therefore, because the record was "clearly insufficient for entry of summary judgment on the discretionary function issue," the panel reversed the district court's order, which had held that the discretionary function exception applied. Id. The more recent case of Valdez v. United States, 56 F.3d 1177, 1180 (9th Cir. 1995), which held that the failure to post warning signs can be protected under the discretionary function exception, is more closely on point. In Valdez, this circuit held that, where policy guidelines outline general policy goals regarding visitor safety,"the means by which [government] employees meet these goals necessarily involves an exercise of discretion." Id. It is immaterial in the present case whether the license was or was not a lease, whether the landowner owed a duty to invitees under the common law, or whether Nevada law might characterize the BLM's actions as willful. These and other arguments of plaintiff are irrelevant to the legal issues involved.
 
 
 25
 This was a tragic accident. However, under the circumstances, the government is not liable for any of Reed's damages.
 
 
 26
 The district court's grant of summary judgment in favor the United States is AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Harlington Wood, Jr., United States Circuit Judge for the Seventh Circuit, sitting by designation.
 
 
 [2]
 A playa is "the flat-floored bottom of an undrained desert basin that becomes at times a shallow lake which on evaporation may leave a deposit of salt or gypsum." WEBSTER'S THIRD NEW INT'L DICTIONARY 1737 (1981).
 
 
 [3]
 See Building Burning Man, THE JOURNAL OF THE BURNING MAN PROJECT, SPRING 1997, at 1.
 
 
 [4]
 Michael Dugan, "Guerilla artists' [sic] blast away, SAN FRANCISCO EXAM'R, Oct. 10, 1995, at A3.
 
 
 [5]
 Burning Man 1996 Events & Attractions handout.
 
 
 [6]
 TIME magazine published an article with pictures of the most recent Burning Man event. Joel Stein, The Man Behind Burning Man, TIME, Sept. 18, 2000, at 76. The event was referred to as a "punk-pagan celebration." Id. Two readers responded to the article in the "Letters to the Editor" column in a following issue. Letters, TIME, Oct. 9, 2000, at 20, 22. One respondent had recently worked with Indians in Nevada and took exception to the "pagan" reference, stating that "the puerile horde that invades the desert on Labor Day has no clue about the earth or true spirituality." The other reader wrote that he had attended the festival for the first time this year. He characterized it as "an example of how everyone should live." This court passes no judgment on the event.
 
 
 [7]
 According to the BLM district manager during the period of these events, because the playa was so vast and flat, the area had been used in 1981 and 1997 to set new land speed records.
 
 
 [8]
 Reed also cites to 43 C.F.R.S 8372, which governs "Special Recreation permits Other Than On Developed Recreation Sites." Subsection 8372.5(a)(1) provides: "The authorized officer may suspend a special recreation permit if necessary to protect public health, public safety, or the environment." Although the parties were unable to state whether 43 C.F.R. S 2920.9-3 or 43 C.F.R. S 8372.5 governed the Burning Man permit, we need not determine the issue because, even assuming the more stringent S 2920.9-3 applies, we conclude that the BLM maintained discretion.