Merle W. HUBER, et al., Plaintiffs,

v.

UNITED STATES of America, et al., Defendants.

UNITED STATES of America, Counterclaimant/Appellant,

v.

MONTEREY NAVIGATION COMPANY, INC., Counterclaim Defendant/Appellee.

No. 86–2574.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 11, 1987.

Decided Feb. 5, 1988.

As Amended on Denial of Rehearings March 18, 1988.

Paul Gary Sterling, Asst. Atty. in Charge, Torts Branch, Civil Div., West Coast Office, U.S. Dept. of Justice, San Francisco, Cal., for defendants-counterclaimant/appellant.

Graydon S. Staring, David W. Condeff and Warren von Bittner, Lillick, McHose & Charles, San Francisco, Cal., for counterclaim defendant/appellee.

Before NORRIS and NOONAN, Circuit Judges, and STEPHENS,[*] District Judge.

NORRIS, Circuit Judge:

On April 10, 1982, the yacht KUHUSHAN sank in a storm off the coast of Marin County, north of San Francisco Bay. Two of the crew members drowned. The survivor and the decedents' representatives sued the United States Coast Guard and Monterey Navigation Company, the owner of a ship involved in the incident, for negligence. The United States and Monterey Navigation jointly settled with the plaintiffs and brought crossclaims for contribution against each other. The government appeals the district court's judgment in favor of Monterey Navigation. We vacate and remand.

I

The yacht KUHUSHAN, a 34–foot sailboat, set sail from San Francisco to Los Angeles on April 9, 1982. When the weather turned foul the next day, she started to return to San Francisco. By late afternoon, a heavy storm was blowing. She first contacted the Coast Guard early in the evening and asked for directions into San Francisco Bay and for the location of a large freighter that the crew had seen anchored nearby. The Coast Guard responded that it could not give navigational assistance, but provided the approximate location of the M/V MARITIME PRIDE, the vessel that the KUHUSHAN had spotted. A few minutes later, the KUHUSHAN notified the Coast Guard that she could not make headway against the winds. The Coast Guard answered that all Coast Guard vessels were busy with capsizes and sinkings of numerous sailboats competing in a race to the Farallon Islands that day, but set up a schedule for maintaining regular radio contact with the KUHUSHAN, and gave the boat's crew some assurance of assistance should it become necessary.

Later in the evening, in response to the KUHUSHAN's request for assistance, the Coast Guard recommended that the KUHUSHAN take shelter alongside of the MARITIME PRIDE until the Coast Guard could help. At this point, the Coast Guard suggested that the KUHUSHAN switch from Channel 16, the radio channel commonly used for small craft communications and distress calls, to Channel 13, a less commonly used frequency.

In order that the MARITIME PRIDE might throw the KUHUSHAN a line, the KUHUSHAN maneuvered alongside of the MARITIME PRIDE. Unfortunately, the attempt failed. In the process, the KUHUSHAN was thrown against the MARITIME PRIDE by the storm, breaking the KUHUSHAN's mast and puncturing her hull. The master of the MARITIME PRIDE saw that the KUHUSHAN had been partially dismasted, but he did not realize that she also had been holed. As the KUHUSHAN drifted out of sight, the master of the MARITIME PRIDE mistakenly assumed that a Coast Guard helicopter observed nearby was already lending assistance. As a result, the master of the MARITIME PRIDE did not inform the Coast Guard that the attempt to secure a line had failed. For its part, the Coast Guard, which had acted as radio intermediary between the two vessels, did not inquire about the success of the MARITIME PRIDE's attempt to throw a line, nor did it investigate when the KUHUSHAN missed the next scheduled communication check.

At about nine p.m., shortly after the accident, the KUHUSHAN took on water and began to sink. The KUHUSHAN called May Day on Channel 13, but no

---

[*] Honorable Albert Lee Stephens, Jr., Senior United States District Judge, Central District of California, sitting by designation.

official Coast Guard personnel heard the call, in part because certain personnel were not manning their assigned stations. After the yacht capsized, the three sailors stayed near it in the water for 45 minutes, expecting assistance from the Coast Guard. When the Coast Guard did not arrive, they attempted to swim to shore. Only one was successful; the other two drowned.

The plaintiffs commenced this action against Monterey Navigation under the general maritime law based on the alleged negligence of the MARITIME PRIDE in attempting to assist the KUHUSHAN, and against the United States under the Suits in Admiralty Act (SIAA), 46 U.S.C. § 742, based on the alleged negligence of the Coast Guard. After the defendants jointly settled with the plaintiffs, a bench trial was held to allocate the respective degree of fault between the United States and Monterey Navigation. The district court determined that the fault lay entirely with the United States, and the government appeals, raising numerous arguments. We need address only two: (1) whether a discretionary function exception similar to the one in the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680(a), immunizes the government from liability; and (2) whether the district court erred in admitting into evidence two Coast Guard investigative reports.

## II

The government contends that the discretionary function exception to the FTCA's waiver of sovereign immunity should be read into the SIAA, that the conduct in question here was a discretionary function, and therefore, that the government is immune from liability for the Coast Guard's handling of the KUHUSHAN sinking.

The SIAA is the maritime analog to the FTCA. It removes the government's traditional cloak of sovereign immunity from maritime tort liability and provides that suit may be brought against the United States "where ... if a private person or property were involved, a proceeding an admiralty could be maintained...." 46 U.S.C. § 742. Unlike the FTCA, however, the SIAA contains no express exception that precludes liability for conduct that is a discretionary function. This circuit has not decided whether a discretionary function exception should be implied in the SIAA.[1] We need not do so here, however, because even if a discretionary function exception were read into the SIAA, it would not apply in this case.

The purpose of the discretionary function exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984). In *Varig Airlines*, persons injured in an air crash alleged that the Federal Aviation Administration (FAA) negligently failed to check thoroughly every airplane that the FAA certified as safe. The Court determined that the FAA had made a discretionary policy decision, permitted under the Congressional grant of authority and under FAA regulations, to use its finite resources to "spot-check" planes, and concluded that this was a decision for which the government could not be held liable in tort. *Varig Airlines*, 467 U.S. at 820, 104 S.Ct. at 2767. The government contends that the instant case similarly involves a discretionary policy decision concerning the allocation of limited resources in rescue operations and that judicial review would involve the courts in second-guessing difficult and delicate Coast Guard policy choices. We disagree.

■ The government's conduct at issue here was not the result of a policy decision about allocation of rescue resources, but

---

1. A number of circuits have implied a discretionary function exception in the SIAA. *See, e.g., Wiggins v. United States*, 799 F.2d 962 (5th Cir.1986); *Williams v. United States*, 747 F.2d 700 (11th Cir.1984); *Gemp v. United States*, 684 F.2d 404 (6th Cir.1982); *Canadian Transport Co.* v. *United States*, 663 F.2d 1081 (D.C.Cir.1980); *Bearce v. United States*, 614 F.2d 556 (7th Cir.), *cert. denied*, 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980); *Gercey v. United States*, 540 F.2d 536 (1st Cir.1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977).

rather the allegedly negligent execution of a course of action that was already chosen. At the time of the KUHUSHAN's sinking, the Coast Guard had already made the policy decision to assist the KUHUSHAN, and had communicated that decision to the crew, who in turn relied upon the Coast Guard's actions. Then the Coast Guard failed to monitor the radio channel it had instructed the KUHUSHAN to use, failed to investigate when the KUHUSHAN missed the scheduled communication check, and, apparently, forgot about the KUHUSHAN in the chaos of the evening. This is not a case where the Coast Guard decided to conserve its resources by not assisting vessels in certain situations. Instead, the Coast Guard decided to aid the KUHUSHAN, and then allegedly did so in a negligent manner.

*Eklof Marine Corp. v. United States,* 762 F.2d 200 (2d Cir.1985), provides a close analogy to the circumstances of this case. In *Eklof,* the Coast Guard was held liable for its negligent placement of a buoy. The court determined that although the Coast Guard had the discretion not to put down the buoy in the first place, once the Coast Guard marked an obstacle so as to engender reliance by passing vessels, then the Coast Guard could be held liable for negligence. In contrast, *Mitchell v. United States,* 787 F.2d 466 (9th Cir.1986), *cert. denied,* —— U.S. ——, 108 S.Ct. 163, 98 L.Ed.2d 118 (1987), presents an example of the corresponding policy decision whether to mark a safety hazard that is shielded from liability. We held that the alleged negligent failure of a public utility to mark ground wires so as to prevent the plaintiff's airplane from flying into them was covered by the discretionary function exception. *Id.* at 468.

In this case, as in *Eklof* and *Mitchell,* the Coast Guard had discretion to choose whether or how to attempt to assist the KUHUSHAN. Once that choice had been made, thereby creating reliance by the KU-HUSHAN's crew, the Coast Guard became liable for its failure, if any, to conform to the applicable standard of care in carrying out or failing to carry out its decision. The Coast Guard's failure to assist after specifically promising assistance was not an act of the nature and quality intended to be unreviewable under the discretionary function exception, and therefore, the government may be held liable for negligence.

### III

After the KUHUSHAN sank, the Coast Guard conducted two investigations and issued public reports.[2] The investigative reports summarized the factual circumstances of the sinking and also included the investigating officer's conclusions as to the cause of the accident and recommendations about ways to avoid similar problems in the future. Specifically, the investigating officers concluded in the reports that there was evidence of errors in judgment or improper procedures on the part of the Coast Guard and that no other party was at fault for the sinking. The government objected to the admission into evidence of the reports' conclusions. A special magistrate held that the reports were admissible in their entirety under Fed.R. Evid. 801(d)(2) as admissions of a party-opponent, and the district court affirmed. The government challenges that ruling, arguing that conclusions and recommendations contained in the reports are not admissible under Rule 801(d)(2) as admissions of party opponent because a Coast Guard regulation expressly precludes use of the reports to affix civil responsibility for marine accidents such as this.

On its face, the regulation supports the government's position. The regulation[3]

---

**2.** Pursuant to 46 C.F.R. § 4.07–1(a) (1986), "[t]he Commandant or District Commander upon receipt of information of a marine casualty or accident, will immediately cause such investigation as may be necessary in accordance with the regulations in this part."

**3.** 46 C.F.R. § 4.07–1(c) (1986) provides:

[T]he investigation will determine as closely as possible:
(1) The cause of the accident;
(2) Whether there is evidence that any failure of material (either physical or design) was involved or contributed to the casualty, so that proper recommendations for the prevention of the recurrence of similar casualties may be made;

explicitly directs that "[t]he investigations of marine casualties and accidents and the determinations made are for the purpose of taking appropriate measures for promoting safety of life and property at sea, and are *not intended to fix civil or criminal responsibility.*" 46 C.F.R. § 4.07–1(b) (1986) (emphasis added). The conclusions of the investigation reports provided highly probative evidence on the issue of the government's negligence as a proximate cause of the sinking of the KUHUSHAN. One report explicitly concluded that "[t]here is evidence of error in judgement or improper communications procedures on the part of Coast Guard Active Duty and Auxiliary personnel," and the other opined that "[t]he controller wrongfully assumed KUHUSHAN was safe, gave it lower priority, but forgot about it. He also failed to supervise the assistant controller. If either had reviewed what notes they had and had they been in a SAR/Incident folder from the start, the results may have been more favorable." Given these and similar candid admissions, it would be difficult to conclude that the reports, if admitted into evidence, could be construed other than "to fix civil ... responsibility." *Id.*[4]

Monterey Navigation does not contest the authority of the Coast Guard to promulgate 46 C.F.R. § 4.07–1(b). Nor could it. Congress has expressly provided that "[t]he Coast Guard shall ... promulgate and enforce regulations for the promotion of safety of life and property on and under the high seas...." 14 U.S.C. § 2; *see* 46 U.S.C. § 239(a) ("The Commandant of the Coast Guard shall prescribe rules and regulations for the investigation of marine casualties ...").[5] By this authority, the Coast Guard established a set of procedures to be followed by its personnel whenever a marine casualty or accident takes place, including a formal investigation of the incident. *See* 46 C.F.R. § 4.07–1 (1986). The Coast Guard has also directed, consistent with its statutory mandate to promote marine safety, that reports of such investigations shall not be used as evidence to assign civil or criminal responsibility for accidents. The reason for this is obvious: were post-accident investigation reports admissible evidence in a later civil proceeding for damages, the investigators might well be reluctant to be completely open and candid in the report, a result which could have adverse consequences for public safety. *See* 23 C. Wright & K. Graham, Federal Practice and Procedure: Evidence § 5437 at 894 (1980).

Our reading of the Coast Guard regulation not only serves Congressional policy in promoting marine safety, it also comports with the reasoning of other courts that have considered this issue. Relying on the language of 47 C.F.R. § 4.07–1(b), other courts have held Coast Guard investigating officers' conclusions and recommendations to be inadmissible as evidence in civil proceedings arising out of accidents covered by the investigation reports. *See, e.g., Smith v. Ithaca Corp.,* 612 F.2d 215, 221–22 (5th Cir.1980); *Complaint of American Export Lines, Inc.,* 73 F.R.D. 454, 458 (S.D.N.Y.1977); *Reliable Transfer Co. v. United States,* 53 F.R.D. 24, 25 (E.D.N.Y. 1971) ("A Coast Guard investigator might feel less free to suggest appropriate mea-

---

(3) Whether there is evidence that any act of misconduct, inattention to duty, negligence or willful violation of the law on the part of any licensed or certificated man contributed to the casualty, so that appropriate proceedings against the license or certificate of such person may be recommended and taken under Title 46, U.S.Code, section 239;

(4) Whether there is evidence that any Coast Guard personnel or any representative or employee of any other government agency or any other person caused or contributed to the cause of the casualty; or

(5) Whether the accident shall be further investigated by a Marine Board of Investigation in accordance with regulations in Subpart 4.09.

**4.** Monterey Navigation suggests that the regulation does not limit the admissibility of investigation reports, but rather simply announces the purposes for which the investigations are conducted. Given the express language of the regulation quoted above, we find this position to be untenable.

**5.** 46 U.S.C. § 239(a) was repealed in 1983 and replaced by 46 U.S.C. § 6301, which is similar in all relevant respects. Pub.L. 98–89, § 4(b), 97 Stat. 600–605 (1983).

 

sures for 'promoting safety of life and property at sea' if he thought that any suggestion of additional precautions might result in imposing pecuniary liability on the government").

Finally, the regulation's treatment of these reports is consistent with the way Congress itself has directed that similar reports prepared by other agencies be treated. Congress has determined that investigative reports prepared by federal agencies charged with the duty of enforcing various federal safety statutes are inadmissible as evidence in suits for damages arising out of accidents covered by the reports. *See, e.g.,* 49 U.S.C. § 1903(c) ("No part of any report of the [National Transportation Safety] Board, relating to any accident or the investigation thereof, shall be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such report or reports."); 49 U.S.C. § 1441(e) (similar provision for reports of aircraft accidents); 42 U.S.C. § 2240 (similar provision relating to investigative reports of licensees of Nuclear Regulatory Commission); 45 U.S.C. § 33 (similar provision for reports of railroad accidents). *See Protectus Alpha Navigation Co., Ltd. v. North Pacific Grain Growers, Inc.,* 767 F.2d 1379, 1384–85 (9th Cir.1985) (investigation reports, "to the extent they express agency views or conclusions as to the probable cause of the accident, are excludable under" 49 U.S.C. § 1903(c)). The only difference between the Coast Guard regulation banning the use of accident reports as evidence and a statute such as 49 U.S.C. § 1441(e) banning the use of aviation accident reports as evidence is that in one the Coast Guard acted pursuant to authority from Congress to promote safety on the high seas, and in the

other, Congress acted directly in promoting air safety. Either way, the result is the same: all or portions of the reports are excluded from evidence on authority of Congress.

Thus, for the same reasons that Congress has prohibited use in private litigation of accident investigative reports prepared by the National Transportation Safety Board and other federal agencies, we hold that under 46 C.F.R. § 4.07–1(b), the Coast Guard investigating officers' conclusions and recommendations in the reports are inadmissible as evidence in this private litigation arising out of the accident that was the subject of the reports.[6] That all or part of the reports might, in the absence of a statute or regulation such as this, be admissible under Fed.R.Evid. 801(d)(2) or some other rule is immaterial. Congress may impose limitations on the admissibility of evidence beyond those provided in the Federal Rules of Evidence. Finally, because the reports concluded that Coast Guard negligence was essentially solely responsible for the tragedy, we find unpersuasive Monterey Navigation's argument that their admission was harmless error.

Accordingly, for the foregoing reasons, we VACATE the judgment and REMAND to the district court for further proceedings consistent with this opinion.[7]

**6.** The district court ruled on a motion in limine that Monterey Navigation could call as expert witnesses the Coast Guard investigators who prepared the reports. On appeal, Monterey Navigation does not defend this ruling, apparently acknowledging the controlling force of the applicable Coast Guard regulation, which provides, with certain exceptions not here relevant: "[A]n employee of the Department [of Transportation—which Coast Guard employees are for this purpose] may not testify as an expert or opinion witness for any party other than the

United States in any legal proceeding in which the United States is involved, but may testify as to facts." 49 C.F.R. § 9.5(a) (1986).

**7.** We express no opinion concerning the proper allocation of fault between the parties. It is for the district court on remand to determine in the first instance how to allocate responsibility for the accident in the absence of the Coast Guard investigating officers' conclusions and recommendations.