276 F.3d 557 (9th Cir. 2002)
 JANE LARGENT ALFREY, PERSONAL REPRESENTATIVE OF THE ESTATE OF THOMAS MARTIN ALFREY, PLAINTIFF-APPELLANT,
v.
UNITED STATES OF AMERICA, DEFENDANT-APPELLEE.
JANE LARGENT ALFREY, PERSONAL REPRESENTATIVE OF THE ESTATE OF THOMAS MARTIN ALFREY, PLAINTIFF-APPELLANT,
v.
JOSEPH H. CRABTREE, WARDEN FCI SHERIDAN; LT. KYLE OLSON, DEFENDANTS-APPELLEES,
AND
LT. STEVEN SALES, B. HUERTE, R. KLINE, JEFFREY C. SULLIVAN, ALL EMPLOYED AT FCI SHERIDAN, AND JOHN DOE NOS. 1-3, ALSO EMPLOYED AT FCI SHERIDAN, ALL SUED INDIVIDUALLY AND AS ACTING AS FEDERAL OFFICERS, DEFENDANTS.
 No. 00-35838
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted September 12, 2001
Filed January 11, 2002
 
 [Copyrighted Material Omitted]
 Counsel Linda K. Williams, Portland, Oregon, for the plaintiff-appellant.
 Craig J. Casey, Assistant United States Attorney, Portland, Oregon, for the defendant-appellee.
 Appeal from the United States District Court for the District of Oregon Malcolm F. Marsh, District Judge, Presiding. D.C. No. CV-99-63-MA, D.C. No. CV-99-1181-MA
 Before: David R. Thompson, A. Wallace Tashima, and Susan P. Graber, Circuit Judges.
 Opinion by Judge Graber; Concurrence in part and dissent in part by Judge Tashima
 Graber, Circuit Judge:
 
 
 1
 In this case, we must decide, first, whether the discretionary-function exception, 28 U.S.C. §§ 2680(a), bars Plaintiff Jane Largent Alfrey's action against the United States (Government) under the Federal Tort Claims Act (FTCA). Plaintiff alleges that the Government's negligence resulted in the death of her husband, Thomas Martin Alfrey, an inmate at the Sheridan Federal Correctional Institution (Sheridan). Specifically, she alleges that the Government negligently assigned her husband to share a cell with an inmate serving a state sentence, who eventually killed him; negligently failed to remove her husband from the cell after his cellmate had threatened him; negligently failed to investigate the cellmate on a computer database; and negligently failed to find the murder weapon during a search of the cell following the threat. With one exception, we conclude that the Government's conduct, even if negligent, involved the exercise of discretionary functions. The exception is Plaintiff's claim that the Government negligently failed to discharge a nondiscretionary duty to perform a "Central Inmate Monitoring" (CIM) evaluation before assigning the state prisoner to share Alfrey's cell, as to which there are genuine issues of material fact. Consequently, 28 U.S.C. §§ 2680(a) bars Plaintiff's action except as to that claim.
 
 
 2
 We also hold that the district court properly dismissed Plaintiff's claims against several individual prison officials under Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971).
 
 
 3
 Accordingly, we affirm in part, reverse in part, and remand in the FTCA action and affirm in the Bivens action.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 4
 In 1978, Thomas Martin Alfrey was convicted in federal court of conspiring to distribute marijuana and of importing marijuana. He was released on parole in 1982. In December 1996, after violating conditions of his parole for a fourth time, Alfrey was confined at Sheridan. He was assigned to bunk 101 in the J-2 housing unit, where he remained until the time of his death.
 
 
 5
 On January 13, 1997, inmate Daniel Casto was assigned to Alfrey's cell. Casto was a prisoner of the State of Oregon who was serving his state sentence at the Eastern Oregon Correctional Institution (EOCI), a state facility. While at EOCI, Casto sent a threatening letter to a judge. Casto was charged with a federal offense and transferred to Sheridan, apparently so that he would be closer to the United States District Court in Eugene, Oregon, where proceedings related to that charge would be heard.
 
 
 6
 In the early evening of January 18, 1997, while walking to the prison library, Alfrey asked to speak with Corrections Officer Sullivan. Alfrey told Sullivan that he wanted to change cells because Casto had threatened to kill him, wrap him up in paper, and hang him on the door for Martin Luther King Day (January 20, 1997). Sullivan told Alfrey that he would ask Lieutenant Olsen to speak with him. Alfrey responded that he did not want to talk to Olsen; he simply wanted to be moved or to have Casto moved.
 
 
 7
 Sullivan reported the conversation to Corrections Officer Hurte.[1] Hurte then telephoned Olsen and reported Alfrey's concerns to him. Olsen asked whether Hurte thought that Alfrey's request might be a "ploy" to move into another cell. Hurte said "yes." Olsen decided not to move Alfrey, in part because Alfrey declined to speak to him personally. Olsen did not check "SENTRY" (a computer database) for information about Casto before making that decision.
 
 
 8
 After the conversation with Alfrey, Hurte and Sullivan and a third officer removed Casto from the cell and searched the cell. The search revealed no weapons, written threats, or other contraband.
 
 
 9
 At about 7:55 p.m. on January 18, Alfrey returned to his cell. At 8 p.m. another inmate reported that Casto was killing Alfrey. Officers immediately went to Alfrey's cell, where they found Alfrey face down on the floor with a"rope" around his neck. The rope was constructed from what appeared to be torn sheets. None of the sheets in the cell was found to be torn.
 
 
 10
 Alfrey was transported to a local hospital. He died that evening. An autopsy determined that the cause of death was "strangulation with severe abdominal trauma and internal bleeding." Casto was convicted of murdering Alfrey and is serving his sentence for Alfrey's murder concurrently with the state sentence.
 
 
 11
 Plaintiff, acting as the personal representative of Alfrey's estate, filed two actions in district court. One, an action under the FTCA, Case No. CV-99-1181-MA, alleged that the Government was liable because of its employees' negligent conduct. The other, a Bivens action, Case No. CV-99-63-MA, alleged that various prison officials had violated Alfrey's First, Fifth, and Eighth Amendment rights by their conduct related to his death.
 
 
 12
 The two actions were consolidated, after which all Defendants filed a motion for summary judgment. The district court granted the motion in its entirety. The court ruled that 28 U.S.C. §§ 2680(a) bars all the FTCA claims because the challenged conduct involved the exercise of discretion. The court also concluded that the allegations in the Bivens action fail to state claims upon which relief can be granted. The court dismissed the case. Plaintiff filed a timely notice of appeal.
 
 STANDARD OF REVIEW
 
 13
 We review de novo a grant of summary judgment. Burrell v. Star Nursery, Inc., 170 F.3d 951, 954 (9th Cir. 1999). Viewing all evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied substantive law. Id. "Whether the United States is immune from liability in an FTCA action is a question of law reviewed de novo." Fang v. United States, 140 F.3d 1238, 1241 (9th Cir. 1998).
 
 DISCUSSION
 I. FTCA Claims
 
 14
 The FTCA waives sovereign immunity for specified tort actions arising out of the conduct of federal employees. 28 U.S.C. §§ 2674; Fang, 140 F.3d at 1241. That waiver, however, is limited. Id. Liability cannot be imposed if the tort claims stem from a federal employee's exercise of a"discretionary function." 28 U.S.C. §§ 2680(a). Title 28 U.S.C. §§ 2680(a) provides that the FTCA waiver of immunity does not extend to
 
 
 15
 [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
 
 
 16
 We lack jurisdiction over any claim to which the discretionary-function exception applies. Sigman v. United States, 217 F.3d 785, 793 (9th Cir. 2000).
 
 
 17
 We answer the question whether the discretionary-function exception bars a particular claim by applying a two-part test. Id. First, we must decide whether the challenged conduct is discretionary, that is, whether it "involv[es] an element of judgment or choice." Fang, 140 F.3d at 1241 (citing Berkovitz v. United States, 486 U.S. 531, 536 (1988)). "This element is not met `when a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow." Id. (quoting Berkovitz , 486 U.S. at 536). If the act is not discretionary, the government is not immune. Id.
 
 
 18
 Second, if the challenged conduct is discretionary, we "must determine whether that judgment is of the kind that the discretionary function exception was designed to shield." Berkovitz, 486 U.S. at 536. "Only those exercises of judgment which involve considerations of social, economic, and political policy are excepted from the FTCA by the discretionary function doctrine." Sigman, 217 F.3d at 793. "The primary focus of the second part of the test is on `the nature of the actions taken and on whether they are susceptible to policy analysis.' " Fang, 140 F.3d at 1241 (quoting United States v. Gaubert, 499 U.S. 315, 325 (1991)). "When a statute, regulation or agency guideline allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. " Weissich v. United States, 4 F.3d 810, 814 (9th Cir. 1993) (citing Gaubert, 499 U.S. at 324).
 
 
 19
 Plaintiff challenges the district court's analysis of both parts of the test. First, she argues that there is a genuine issue of material fact as to whether the Government violated nondiscretionary duties imposed by regulations or guidelines when it assigned Casto and Alfrey to the same cell and when it investigated Casto's threat. Second, she asserts that the discretionary-function exception does not apply because the allegedly negligent conduct does not involve considerations of social, economic, or political policy.
 
 
 20
 A. Whether the Government had a non-discretionary duty to perform a CIM evaluation of Casto or run a SENTRY check on him.
 
 
 21
 In support of its motion for summary judgment, the Government presented evidence, in the form of deposition testimony, that there are no regulations, policies, or other prison guidelines that impose mandatory duties on corrections officers related to cell assignment or the investigation of threats made by inmates. Plaintiff argues on appeal that other evidence creates two genuine issues of material fact.
 
 
 22
 (1) CIM Evaluation
 
 
 23
 Plaintiff first contends that the regulations governing CIM cases create a genuine issue of material fact precluding summary judgment on the question whether the Government was required to perform a CIM evaluation of Casto before assigning him to a cell. She argues that, under the regulations, a CIM evaluation for each inmate is mandatory; that the CIM evaluation is a component of the cell-assignment process; that the Government failed to perform the mandatory CIM evaluation; and that, as a result of that failure, Alfrey suffered harm. We agree that genuine issues of fact remain to be resolved.
 
 
 24
 The text of 28 C.F.R. §§ 524.73 makes it clear that CIM classification is, with listed exceptions, discretionary: "Except as provided for in paragraphs (a)(1) through (4) of this section, an inmate . . . may be classified as a CIM case at any time . . . ." 28 C.F.R. §§ 524.73(a) (emphasis added); see also 28 C.F.R. §§ 524.73(c) (providing that a CIM classification "may" be made at any level). Despite that usual discretion, the second exception may apply here. Some state prisoners receive a CIM designation "automatically":
 
 
 25
 State prisoners. Appropriate staff in the Central Office or Regional Office designate state prisoners accepted into the Bureau of Prisons from state or territorial jurisdictions. All state prisoners while solely in the service of the state sentence are automatically included in the CIM system to facilitate designations, transfers, court appearances, and other movements.
 
 
 26
 28 C.F.R. §§ 524.73(a)(2).
 
 
 27
 Casto was a state prisoner "in the service of the state sentence." It is not clear, however, whether he was accepted into Sheridan "solely" for that reason. He also was awaiting proceedings on a pending federal charge, and the record does not disclose whether the Government could or would have detained Casto at Sheridan had he not been serving a state sentence. It also is unclear whether, when a state prisoner is "automatically included in the CIM system to facilitate designations, transfers, court appearances, and other movements," a non-discretionary duty arises to perform a CIM evaluation before making a cell assignment.
 
 
 28
 If Casto was accepted into Sheridan "solely in the service of the state sentence," and if the regulation in such a circumstance imposes an obligation to perform a CIM evaluation when making a cell assignment, then the regulation imposed a non-discretionary duty "automatically" to perform such an evaluation before placing Casto in Alfrey's cell. If Casto was accepted into Sheridan for other or additional reasons, then a CIM evaluation was discretionary.
 
 
 29
 The CIM evaluation, if mandatory in the circumstance, could have affected Casto's cell assignment and might have caused him not to be housed with Alfrey, a federal prisoner. As the comments accompanying the administrative rule explain:
 
 
 30
 Section 524.72(f),[2] "State Prisoners," is new. This assignment includes persons, other than witness security cases, accepted into the Bureau of Prisons for service of their state sentences. This assignment provides the Bureau with a management tool to quickly identify state prisoners. The information is necessary for several reasons, including, where appropriate, to separate state prisoners.
 
 
 31
 Central Inmate Monitoring System, 47 Fed. Reg. 22000, 22001 (May 20, 1982) (emphasis added).
 
 
 32
 For these reasons, the district court erred when it ruled that there was no genuine issue of material fact as to whether the Government had a non-discretionary duty to perform a CIM evaluation of Casto as part of his cell-assignment process.
 
 
 33
 (2) SENTRY Search
 
 
 34
 Plaintiff also asserts that there is a disputed issue of fact as to whether Olsen had a non-discretionary duty to run a SENTRY search on Casto after Alfrey reported Casto's threat. We disagree.
 
 
 35
 Plaintiff presented no evidence that prison employees had a duty to run a SENTRY search. Instead, she argued below (and repeats on appeal) that evidence that Olsen falsely reported that he had run a SENTRY search is evidence that Olsen may have thought that he had a duty to run such a search. Plaintiff then reasons that, if Olsen thought he should have run a SENTRY search, there is a disputed issue of material fact as to whether such a search was in fact mandatory under some federal regulation or prison policy. Even assuming that Olsen had such a motive, which is speculative,[3] it is not evidence of the actual existence of a regulatory or policy-based duty to run a SENTRY search. The district court did not err in this regard.
 
 
 36
 B. Whether the Government's challenged decisions involved social, economic, or political-policy considerations.
 
 
 37
 We turn now to the second part of the discretionary-function analysis. Plaintiff contends that agents of the Government were negligent in responding to the report of Casto's threat and that their negligent acts did not involve discretion of the kind that is protected by the discretionary-function exception. Specifically, she argues that the officers' failure to search the cell in a way that would have enabled them to find the rope, and Olsen's failure to run a search on SENTRY, were decisions that were grounded in occupational judgment, not in social, economic, or political judgment.
 
 
 38
 Plaintiff's argument fails for two reasons. First, federal regulations expressly give prison officials discretion in how to respond to reports of threats by inmates and in how to search cells. Therefore, it must be presumed that the officials' choices in responding to the report of Casto's threat were based in public policy. Gaubert, 499 U.S. at 324; Weissich, 4 F.3d at 814. Second, even in the absence of a presumption, the challenged conduct of the prison officials involves the type of policy judgment protected by the discretionary-function exception.
 
 
 39
 This case resembles Calderon v. United States , 123 F.3d 947 (7th Cir. 1997). In that case, as in this one, an inmate was attacked by his cellmate after the inmate had reported to officers that his cellmate had threatened him. Id. at 948. The inmate sued the United States under the FTCA, alleging that prison officials negligently had failed to separate the plaintiff from his cellmate and to prevent the attack. Id. at 948-49.
 
 
 40
 The Calderon court held that 28 U.S.C. §§ 2680(a) barred the inmate's claims against the United States. It reasoned that federal regulations vested discretion in the prison officials to determine how to address the inmate's report of the threat and that, therefore, it was required to presume that the officials' conduct was grounded in policy considerations. Id. at 949-50. The court quoted 28 C.F.R. §§ 541.10:
 
 
 41
 "Staff shall take disciplinary action at such times and to the degree necessary to regulate an inmate's behavior within . . . Bureau rules and institution guidelines and to promote a safe and orderly institution environment."
 
 
 42
 Id. at 949 (quoting 28 C.F.R. §§ 541.10) (emphasis added by the Calderon court). The court then observed that 28 C.F.R. §§ 541.13 prohibits an inmate from " `[t]hreatening another with bodily harm.' " Id. (quoting 28 C.F.R. §§ 541.13). The court further observed that 28 C.F.R. §§ 541.14 grants prison staff discretion to determine how to address a disciplinary violation: " `[W]hen [the] staff witnesses or has reasonable belief that a violation of Bureau regulations has been committed by an inmate, and when staff considers informal resolution of the incident inappropriate or unsuccessful, staff shall prepare an Incident Report and promptly forward it to the appropriate Lieutenant.' " Id. (quoting 28 C.F.R. §§ 541.14(a)) (emphasis added by the Calderon court).
 
 
 43
 Relying on the emphasized text in the quoted regulations, the Calderon court held that the regulations vested discretion in the Bureau of Prisons to determine how to respond to the plaintiff's report of his cellmate's threats. Id. at 949-50. For two reasons, the court further concluded that the type of discretion involved was of a kind protected by the discretionary-function exception. First, because the regulations explicitly confer discretion, the court presumed -as directed by the Supreme Court in Gaubert -that the officers' conduct was grounded in policy considerations. Id. at 950. Second, the court concluded that "[i]t is clear that balancing the need to provide inmate security with the rights of inmates to circulate and socialize within the prison involves considerations based upon public policy." Id. at 951. Consequently, the court held that the government's discretion not to separate the plaintiff from his cellmate was protected by the discretionary-function exception. Id.
 
 
 44
 We are persuaded by that reasoning. Under the regulations cited by the Calderon court, the officers at Sheridan had discretion to choose how to respond to a reported threat. Additionally, the regulations that govern cell searches confirm that the choice of the appropriate manner in which to search a cell is left to the discretion of the individual corrections officer. Title 28 C.F.R. §§ 552.10 authorizes the Bureau of Prisons to conduct "searches of inmates and of inmate housing and work areas." It directs prison staff to "employ the least intrusive method of search practicable, as indicated by the type of contraband and the method of suspected introduction. " Id. That is, the regulation explicitly confers discretion on prison staff to decide how to search a cell in view of the particular threat presented and the practicalities of the situation. Because those regulations permit the prison staff to exercise discretion, we presume, in accordance with Gaubert and Weissich, that their exercise of that discretion here -in choosing how to search the cell and choosing not to run a SENTRY search -was grounded in policy considerations.
 
 
 45
 Moreover, independent of any presumption, that discretion is the kind protected by the discretionary-function exception. A prison official's judgment about how extensively to search a cell involves a balancing of the potential risk, on the one hand, against the inmate's interest in being free from overly intrusive searches, on the other. Similarly, to decide what steps to take in response to a reported threat, an officer must set priorities among all extant risks: the risk presented by the reported threat, along with the other risks that inevitably arise in a prison. Those types of decisions implicate social and public-policy considerations.
 
 
 46
 Our own holding in Sabow v. United States, 93 F.3d 1445 (9th Cir. 1996), confirms that Calderon supplies the correct analysis of whether the discretionary-function exception protects prison officials' conduct in investigating a threat made by an inmate, including the officials' method of searching a cell. There, we "recognized that the discretionary function exception protects agency decisions concerning the scope and manner in which it conducts an investigation so long as the agency does not violate a mandatory directive." Vickers v. United States, 228 F.3d 944, 951 (9th Cir. 2000) (summarizing the holding in Sabow, 93 F.3d at 1451-54) (emphasis added).
 
 
 47
 In Sabow, the family of a decedent sued the United States for negligent infliction of emotional distress stemming from an investigation of the decedent's death by the Naval Investigative Services (NIS) and the Office of the Judge Advocate General (JAG). Sabow, 93 F.3d at 1449-50. We acknowledged that "some of the actions and inactions alleged by the Sabows, if true, represent alarming instances of poor judgment and a general disregard for sound investigative procedure." Id. at 1454. Nevertheless, because federal investigations "clearly require investigative officers to consider relevant political and social circumstances in making decisions about the nature and scope of a criminal investigation," we held that, in the absence of mandatory directives governing how to perform investigations,[4] the discretionary function exception barred the plaintiffs' claims relating to the negligent conduct of the investigation. Id. at 1453-54. That holding applies to any criminal or quasi-criminal investigation; an investigation into a death threat is an investigation of that nature.
 
 
 48
 Indeed, Plaintiff concedes -and the dissent agrees (dissent at 528-29) -that the choices whether to search the cell and whether to investigate Casto's threat involved policy judgments. She asserts, however, that the prison officials' subsidiary choice of the manner in which to search the cell, and the subsidiary decision not to run a SENTRY search, involved merely occupational or professional judgment. Ordinary occupational or professional judgments are not protected by the discretionary-function exception. Sigman , 217 F.3d at 796. We are not persuaded that the discretion involved here is properly characterized as ordinary occupational or professional judgment.
 
 
 49
 As we recognized in Sabow, investigations by federal officers clearly involve the type of policy judgment protected by the discretionary-function exception, and neither the facts in this case nor our analysis in Sigman dictates a contrary conclusion.
 
 
 50
 In Sigman, we held that the discretionary-function exception does not apply when "the claim is for negligence in performing a function that is analogous to functions performed by professionals in the private sphere every day. " 217 F.3d at 795-96. Thus, we held that the exception did not shield military physicians from liability arising from negligent medical practices. Id. at 796; see also Fang, 140 F.3d at 1242-43 (holding that the discretionary-function exception did not apply to medical negligence by federal Emergency Medical Technicians).
 
 
 51
 For three reasons, the Government's choices about how to respond to Alfrey's report of Casto's threat are not like the daily functions of professionals in the private sphere:
 
 
 52
 * First, the acts of performing a cell search and of responding to a report of inmate misconduct are unique to the context of prisons. Those acts are core prison functions for which there are no private-sector analogues.
 
 
 53
 * Second, as discussed above, federal regulations grant prison officials discretion to determine how to search a cell and how to respond to a threat. As a result, the Government is entitled to a presumption that those determinations are based on policy considerations.
 
 
 54
 * Third, medical personnel are governed by professional and scientific standards that are independent of their federal employer and its policy judgments. By contrast, no external professional standards dictate how to perform a cell search in particular circumstances.[5] Neither are there such standards informing prison officials of what steps ought to be taken to investigate reported inmate misconduct.
 
 
 55
 Of course, in some sense, the choices here involved professional judgment. For example, a prison official's assessment of what type of search is needed is informed by professional training and experience. But that fact alone does not remove the decisions from the realm of policy-based judgments. Cf. Calderon, 123 F.3d at 950-51 (recognizing that even ordinary, "day to day" decisions of corrections officers involve "considerations of public policy").
 
 
 56
 Sadly, in this case, the officers' choice of how extensively to search the cell did not result in their finding the rope. And, it is unclear whether Olsen's performance of a SENTRY search might have helped to prevent Alfrey's death. However, neither the result of those choices nor the possible negligence of those choices means that the choices themselves involved no policy judgment.
 
 
 57
 The cases cited by the dissent do not counsel a different result. As the dissent notes, one did not involve the discretionary-function exception, and the other was not an action under the Federal Tort Claims Act. (Dissent at 530 n.2 & 531 n.3.). Other important distinctions exist as well.
 
 
 58
 With respect to Indian Towing Co. v. United States, 350 U.S. 61 (1955): First, a lighthouse light is either on or off. There is no middle ground. Here, a search is either made or not made -but there are many ways to conduct a search. The existence of a range of options makes this case different and gives rise to discretionary function immunity. Second, maintaining a physical object in good working order is ministerial, and it is subject to external, objective professional standards. As explained above, that is not the case here.
 
 
 59
 With respect to Huber v. United States, 838 F.2d 398 (9th Cir. 1988): First, in that case the government's choice did not implicate an allocation of resources. Id. at 400. By contrast, here, as the dissent recognizes (dissent at 537 n.9), there were fights in the prison the night Alfrey died, and the length and nature of the cell search implicated the deployment of prison personnel. Second, in this case, a federal regulation (quoted above) expressly commits the decision of how to conduct searches to prison officials, under specified guidelines that require the officials to balance and consider the intrusiveness of a search to the prisoner, the type of contraband, and the method of suspected introduction of the contraband. In Huber we cited no similar regulation giving the Coast Guard discretion. Third, the kinds of interests that had to be balanced here (including allocation of resources, privacy concerns, and nature of the suspected threat) are more related to public policy than are questions (for example) of when to monitor a radio channel.
 
 
 60
 In short, the prison officials' decisions related to how to search Alfrey and Casto's cell and how to investigate the reported threat were grounded in policy considerations. The district court correctly held that 28 U.S.C. §§ 2680(a) bars Plaintiff's claims that the Government negligently failed to find the rope in the cell and negligently failed to run a SENTRY search on Casto.
 
 II. Bivens Claims
 
 61
 The district court properly dismissed the constitutional claims raised against the individual defendants in the Bivens action.
 
 
 62
 Plaintiff's First Amendment and Eighth Amendment claims involve an element of improper motive. When subjective intent is an element of a Bivens claim, a heightened pleading standard applies. Harris v. Roderick, 126 F.3d 1189, 1195 (9th Cir. 1997). A plaintiff must include " `nonconclusory allegations containing evidence of unlawful intent.' " Id. (quoting Branch v. Tunnell, 937 F.2d 1382, 1386 (9th Cir. 1991)).
 
 
 63
 The Bivens complaint in this case does not meet that standard. It contains nothing but conclusory allegations of unlawful intent and alleges no facts supporting an inference of unlawful intent. Plaintiff's memorandum in opposition to summary judgment did nothing to cure the deficiency, and Plaintiff never asked to amend the complaint. The district court properly dismissed the First and Eighth Amendment claims.
 
 
 64
 The Fifth Amendment claim alleges that the individual defendants' act of incarcerating Alfrey with Casto after they learned of Casto's threat was "so discriminatory and blatantly wanton" that it violated Alfrey's Fifth Amendment due process rights. However, the facts alleged by Plaintiff support, at most, a claim for negligence. Because a government official's negligent conduct does not implicate the Due Process Clause, Daniels v. Williams, 474 U.S. 327, 334-36 (1986), the district court correctly dismissed that claim as well.
 
 
 65
 AFFIRMED in part, REVERSED in part, and REMANDED in Case No. CV-99-1181-MA; AFFIRMED in Case No. CV-99-63-MA. All parties to bear their own costs on appeal.
 
 
 
 Notes:
 
 
 [1]
 Defendants' brief advises us that the caption of the complaint incorrectly shows a spelling of "Huerte."
 
 
 [2]
 When the "State prisoners " category was first included in 28 C.F.R. §§ 524.72 in 1982, it was designated as subsection (f). In the form of the regulation in effect at the time Casto entered Sheridan, it was (and still is) subsection (e). Central Inmate Monitoring System, 61 Fed. Reg. 40142 (July 31, 1996); 28 C.F.R. §§ 524.72(e) (2001).
 
 
 [3]
 Other motives are possible. For example, Olsen may have been mistaken about whether he ran a search, or he may have wanted to appear more diligent than he was but without believing that he was required to be diligent in any particular way. For the purpose of summary judgment, we assume that Plaintiff's speculation is accurate.
 
 
 [4]
 In reaching our conclusion, we examined both the JAG manual on investigative procedures and the NIS manual on investigative procedures and found that, although both recommended certain investigatory procedures, neither mandated particular procedures. Sabow, 93 F.3d at 1452-53.
 
 
 [5]
 At least, there is no evidence in the record of any such standards.
 
 
 
 66
 TASHIMA, Circuit Judge, concurring in part and dissenting in part:
 
 
 67
 I concur in all of the majority opinion, except for its holding that the discretionary function exception to liability under the Federal Tort Claims Act (FTCA) immunizes the negligent cell search, and the majority's reasoning in reaching that result.
 
 
 68
 Thomas Martin Alfrey was murdered by his cellmate Daniel Casto after alerting authorities at the Sheridan Federal Correctional Institution that Casto had threatened to"hang" him to death. Sheridan authorities found Casto's threat sufficiently credible to order a search of the cell; however, that search turned up no weapons or other contraband and Alfrey was summarily returned to his cell. A short time later, Alfrey was found dead, strangled to death by Casto with a makeshift "rope" made from torn sheets. This "rope " was apparently smuggled into the cell, as none of the sheets in the cell were torn. As it turns out, the prison guards who searched Alfrey's cell were not specifically instructed to look for materials that could be used to hang or strangle Alfrey; therefore, they neither removed the sheets or blankets from the bunks, nor looked inside the pillows in the cell.
 
 
 69
 The majority today holds that the search of Alfrey's cell, even if performed negligently, involved the exercise of prison authorities' discretionary functions, thus barring liability under the FTCA. See 28 U.S.C. §§ 2680(a). In so holding, however, the majority fails adequately to distinguish between the prison authorities' decision to search a cell, which unquestionably is governed by public policy considerations and thus implicates the discretionary function exception, and the carrying out of that decision to conduct a search, which is governed by ordinary due care and occupational judgment, and thus does not implicate the discretionary function exception.
 
 
 70
 Decisions involving cell assignment and whether to investigate alleged inmate threats may be close to the core of statutory, policy discretion afforded correctional authorities in performing their duties. Such decisions are what the Supreme Court had in mind when it held: " `Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.' " Whitley v. Albers, 475 U.S. 312, 321-22 (1986) (quoting Bell v. Wolfish, 441 U.S. 520, 547 (1979)).
 
 
 71
 Once a decision to investigate inmate threats has been made, however, and that investigation initiated, there is a legitimate expectation that the investigation will be conducted with due care. Both the Supreme Court and this court have long distinguished between the government's decision to act or provide a service, and the (negligent) performance of that act or service. In Indian Towing Co. v. United States, 350 U.S. 61 (1955), the Court considered a FTCA action initiated by a barge charterer and others when a tug went aground and the barge cargo was damaged, allegedly because of negligent operation of a lighthouse by the Coast Guard.[1] While the government asserted that this claim was barred by the FTCA, the Court rejected this argument, focusing on the distinction between the initiation of a service and the negligent performance of that service:
 
 
 72
 The Coast Guard need not undertake the light-house service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused by petitioners, the United States is liable under the Tort Claims Act.
 
 Id. at 69.[2]
 
 73
 This court too has distinguished the government's decision to act or provide a service from the manner in which it acts or provides that service, finding, in appropriate cases, that the discretionary function exception shields the former, but not the latter, from FTCA liability. In Huber v. United States, 838 F.2d 398 (9th Cir. 1988), the owner of a sailboat, which had sunk and killed two crewmen, settled claims with the crewmen's dependents and then alleged Coast Guard negligence, seeking contribution from the United States.[3] Upon encountering particularly poor weather, the sailboat Kuhushan had radioed the Coast Guard for assistance. The Coast Guard was unable to send out immediate assistance, but it assured the crew that it would provide assistance if the situation became sufficiently dire. The Coast Guard also coordinated a rescue effort between the sailboat and another close-by vessel. After that rescue effort failed, the Coast Guard neither followed up on the effort's success nor responded to further distress calls from the Kuhushan.
 
 
 74
 The government argued that the contribution claim was barred by the discretionary function exception, asserting that allocating limited resources in rescue operations were discretionary decisions best left to the Coast Guard, not the courts.[4] Rejecting the government's argument, this court focused on the distinction between Coast Guard discretion to initiate a rescue, and the standard of care expected of the Coast Guard during rescues that have been initiated:
 
 
 75
 The government's conduct at issue here was not the result of a policy decision about allocation of rescue resources, but rather the allegedly negligent execution of a course of action that was already chosen. At the time of the KUHUSHAN's sinking, the Coast Guard had already made the policy decision to assist the KUHUSHAN, and had communicated that decision to the crew, who in turn relied upon the Coast Guard's actions. Then the Coast Guard failed to monitor the radio channel it had instructed the KUHUSHAN to use, failed to investigate when the KUHUSHAN missed the scheduled communication check, and, apparently, forgot about the KUHUSHAN in the chaos of the evening. This is not a case where the Coast Guard decided to conserve its resources by not assisting vessels in certain situations. Instead, the Coast Guard decided to aid the KUHUSHAN, and then allegedly did so in a negligent manner.
 
 
 76
 In this case . . . the Coast Guard had discretion to choose whether or how to attempt to assist the KUHUSHAN. Once that choice had been made, thereby creating reliance by the KUHUSHAN's crew, the Coast Guard became liable for its failure, if any, to conform to the applicable standard of care in carrying out or failing to carry out its decision. The Coast Guard's failure to assist after specifically promising assistance was not an act of the nature and quality intended to be unreviewable under the discretionary function exception, and therefore, the government may be held liable for negligence.
 
 
 77
 Id. at 400-01.
 
 
 78
 In light of Indian Towing and Huber, it is important conceptually to separate the decision to search the Casto/Alfrey cell from the actual search, conducted after that discretionary decision had been made. While the former decision obviously is grounded in public policy (i.e., assuring flexibility in prison authorities' response to inmate threats), it cannot be said that the manner of conducting the search was likewise grounded in public policy. The officers who searched Alfrey's cell certainly should have been told that they were looking for materials that could be used to "hang" Alfrey and, in making the search, they should have at the very least removed the bed sheets and blankets and looked inside the pillows.
 
 
 79
 The majority relies heavily on Calderon v. United States, 123 F.3d 947 (7th Cir. 1997), in concluding that the cell search fell under the discretionary function exception. Calderon, however, involved a situation where an inmate repeatedly reported threats by his cellmate before being attacked and injured, but where "prison personnel took no steps to protect Calderon . . . ." 123 F.3d at 948 (emphasis added). Given that Calderon only considered whether the decision to initiate investigation of inmate threats is protected by the discretionary function exception, a question not at issue here, I fail to see how Calderon illuminates the question at hand.
 
 
 80
 The majority broadly characterizes Calderon as holding that the Bureau of Prisons had the discretion "to determine how to respond to the plaintiff's report of his cellmate's threats." Maj op. at 521 (citing 123 F.3d at 949-50). What the court more precisely held, however, was that "the BOP's decision not to separate Calderon and Perez is properly classified as a discretionary act." Calderon, 123 F.3d at 950 (emphasis added). And, indeed, that is exactly the same decision (i.e., cell assignment) that we have unanimously agreed (with the exception of the CIM issue) is subject to the discretionary function exception.[5] Calderon does not reach what is at issue here--the negligent search of a cell, after the cell-search decision has been made.
 
 
 81
 The majority further relies on Sabow v. United States, 93 F.3d 1445 (9th Cir. 1996), to argue that the discretionary function exception immunizes prison officials when they negligently search an inmate's cell. Sabow, however, merely held that an administrative/criminal investigation was protected by the discretionary function exception. There is, however, a substantial and legally significant difference between the search of a two-man, sparsely-furnished prison cell and the ongoing, administrative or criminal investigation at issue in Sabow. While day-to-day policy considerations commonly run throughout these often complex administrative and criminal investigations, the policy component of a cell search decision had run its course, once the prison officials decided that Casto's threat was sufficiently serious to justify a cell search. The cell search itself was but the ministerial implementation of that policy decision. After all, how much policy discretion can be involved in the search of a two-man prison cell, an area of perhaps 120-150 square feet? To equate such a cell-search with an ongoing criminal investigation is to put no limit on the application of the discretionary function exception. The majority's reasoning equates the discretion involved in the search of a two-man prison cell with the discretion involved in the search of the Tora Bora region of Afghanistan --there simply is no limiting principle.[6]
 
 
 82
 Prison administrators obviously do not have the resources to search regularly every cell. The decision to search one over another, or not to search any at all, requires a balancing of conflicting policy needs and is thus protected by the discretionary function exception. Once prison administrators have determined that a particular cell should be searched, however, the actual search of that confined, two-man cell is not susceptible to policy analysis.[7]
 
 
 83
 While there may be, as the majority observes, "many ways to conduct a [cell] search," Maj. op. at 526, this is not the operative consideration for the discretionary function exception analysis. Rather, the appropriate question is whether the officials' choice among the "many ways to conduct a cell search" was itself susceptible to policy analysis. Cunningham v. United States, 786 F.2d 1445, 1447 (9th Cir. 1986) ("The purpose of the [discretionary function] exception is to prevent judicial second-guessing of administrative decisionmaking based on social, economic, and political policy. If judicial review would encroach upon this type of balancing done by an agency, then the exception would apply.") (internal citations and quotation marks omitted). The majority answers this question by invoking the public policies of inmate privacy, resource tradeoff, and inmate security. Maj. op. at 522-23, 526. The record, however, supports none of these asserted public policies as a justification for applying the discretionary function exception to the prison officials' search of Alfrey's cell.
 
 
 84
 First, while inmates do not wholly forfeit their right to privacy simply by virtue of their confinement, their privacy rights are substantially curtailed, particularly when it comes to searching for weapons and contraband in response to what prison administrators view to be a credible threat. Bell v. Wolfish, 441 U.S. at 557 ("No one can rationally doubt that room searches represent an appropriate security measure . . . . And even the most zealous advocate of prisoners' rights would not suggest that a warrant is required to conduct such a search. Detainees' drawers, beds, and personal items may be searched . . . ."). Since Casto did not have a reasonable expectation of privacy, particularly in light of his threats, I fail to see how the public policy of inmate privacy could have been operative in the prison officials' choice of how to search the cell. The majority neither cites a single case where a prisoner's "interest in being free from overly intrusive searches" was relied upon as a justification to curtail meaningfully a prison's search for weapons, nor demonstrates how a careful search of Alfrey's cell would have unduly compromised Casto's privacy to any greater extent than a negligent search.
 
 
 85
 Second, I do not agree that a non-negligent search of Alfrey's cell would have required the expenditure of significantly more correctional resources than would a negligent search. While it certainly might have consumed some additional time to search Alfrey's cell with due care, cases like Huber suggest that such a nominal added burden does not bring such discretion under the protected rubric of"public policy." In Huber, once the Coast Guard had made the decision to assist the fated sailboat, providing help in a non-negligent manner certainly would have expended more Coast Guard resources. This court, however, found the resources argument insufficient to insulate the Coast Guard's actions from suit.[8] Analogously, establishing that public policy is at work during a cell search requires more than some mere hypothesized risk that the nominal added expense of a non-negligent search would undermine the need to address other security concerns. The fact that the record does not establish that such an institutional tradeoff was present during the investigation of Casto's threat at the very least reveals that dismissal of this case via summary judgment was inappropriate.[9]
 
 
 86
 Finally, the majority presumes that the officers' search of Alfrey's cell was grounded in public policy because Bureau of Prison regulations granted the officers investigatory discretion. See Maj. op. at 522, 525. The majority, however, reads too much into the regulation. The regulation the majority relies on, 28 C.F.R. §§ 552.10, is only the"Purpose and Scope" preamble to Subpart B, and cannot be read as a discretion-granting regulation, particularly in light of the specific regulation that governs "housing" searches. The only discretion expressly granted by that regulation is that a cell (housing) search may be conducted with or without notice and without the inmate being present. 28 C.F.R., §§ 552.14(a). Prison staff are also instructed to "leave the housing . . . area as nearly as practicable in its original order," 28 C.F.R.§§ 552.14(b), which admits room for the exercise only of some minimal, non-policy-implicating discretion. Thus, the regulations do not contain the kind of discretion to which the majority refers.[10] Even if they did grant such discretion, cases like United States v. Gaubert, 499 U.S. 315 (1991), and Weissich v. United States, 4 F.3d 810 (9th Cir. 1993), do not stand for the proposition that every time a government agent acts under discretion granted by a regulation, that action presumptively operates under the rubric of public policy. If this were the case, it would make little sense to have the two-pronged Berkovitz test at all, see 486 U.S. at 536-37, for a finding of statutorily-prescribed discretion would itself "presume" the second prong. Rather, as the Court said in Gaubert, "[f]or a complaint to survive a motion to dismiss [on the basis of the discretionary function exception], it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." 499 U.S. at 324-25.
 
 
 87
 Here, the asserted "polic[ies] of the regulatory regime" are prison safety, resource allocation, and prisoner privacy. Neither the case law nor the record, however, supports the majority's conclusion that, once the decision to conduct a cell search has been made, requiring that the search of Alfrey's cell be conducted with ordinary care would have eroded correctional safety, unduly compromised prisoner privacy, or required the allocation of significantly more resources. In light of this record, any presumption of operative public policy that might otherwise exist is rebutted. And, in the end, the majority's position depends on its over-reliance on this "presumption." But such over-reliance, I submit, effectively negates Berkovitz's second requirement to determine whether the judgment involved "is of the kind that the discretionary function exception was designed to shield." Berkovitz, 486 U.S. at 536.
 
 
 88
 For these reasons, I respectfully dissent from the application of the discretionary function exception to the negligent cell search in this case.
 
 
 
 Notes:
 
 
 [1]
 The majority distinguishes Indian Towing by arguing that while "a lighthouse is either on or off," the maintenance of which is merely "ministerial . . . subject to external, objective professional standards," the "range of options [at work in the cell search] . . . gives rise to discretionary function immunity." Maj. op. at 526. But the facts in Indian Towing are not quite as simplistic as the majority suggests. For example, one could ask why was there not a back-up system in case the primary system became non-functional? The key question is whether the"range of options" available to those who maintained the lighthouse on Chandeleur Island were any more "ministerial" than those at work in the search of Alfrey's cell. As discussed below, the record does not establish that public policy was at play in the prison officials' choice amongst the"range" of cell-search options. As such, I do not find Indian Towing to be as easily cast aside as does the majority.
 
 
 [2]
 While Indian Towing did not involve the discretionary function exception per se, in that the government there conceded that the exception did not apply, 350 U.S. at 64, subsequent discretionary function jurisprudence has relied upon Indian Towing when distinguishing between a government's decision to act and the (negligent) performance of that act. See Berkovitz v. United States, 486 U.S. 531, 538 n.3 (1988) ("[Indian Towing] illuminates the appropriate scope of the discretionary function exception . . . . [T]he initial decision to undertake and maintain lighthouse service was a discretionary judgment. The Court held, however, that the failure to maintain the lighthouse in good condition subjected the Government to suit under the FTCA."); Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1024 (9th Cir. 1989) (holding that while the decision to build a lighthouse in a particular location fell under the Coast Guard's discretionary, policy authority, the decisions to "inspect[ ], repair[ ] and maintain[ ] the lighthouse involved decisions grounded not on political, economic or social, but rather on technological or scientific considerations"); Ochran v. United States, 117 F.3d 495, 506 (11th Cir. 1997) ("[Indian Towing] involved discretion grounded in public policy considerations only at one level: whether the Coast Guard would undertake to operate the lighthouse. Significantly, the judgments involved in deciding how to operate the lighthouse were not grounded in public policy consideration." (emphasis in the original)).
 
 
 [3]
 This contribution claim was brought under the Suits in Admiralty Act (SAA), 46 U.S.C. §§742, not the FTCA. This difference, however, is immaterial because the legal question was whether the discretionary function exception of the FTCA should be read into the SIAA. The court assumed that it should and simply evaluated the claim under the traditional discretionary function exception analysis, an assumption that was later vindicated in Earles v. United States, 935 F.2d 1028, 1030-32 (9th Cir.1991) (holding that the discretionary function exception applies to the SAA).
 
 
 [4]
 While the majority observes that"[i]n Huber we cited no . . . regulation giving the Coast Guard discretion," Maj. op. at 526, it ignores that the Coast Guard clearly has statutorily-granted discretion in deciding how to go about its rescue operations. See, e.g., 14 U.S.C. §§ 88(a) (2001) ("In order to render aid to distressed persons, vessels, and aircraft . . . the Coast Guard may perform any and all acts necessary to rescue and aid persons and protect and save property . . . .") (emphasis added).
 
 
 [5]
 Even assuming that Calderon could be read to support the majority's broad reading, the decision of "how to respond to the plaintiff's report of his cellmate's threats" had already been made by prison officials when they decided to conduct the cell search.
 
 
 [6]
 The majority, in insisting that Sabow's "holding applies to any criminal or quasi-criminal investigation" and that "an investigation into a death threat is an investigation of that nature," Maj. op. at 524, willfully blinds itself to the distinction between a broad-based, ongoing investigation, which was at issue in Sabow, and the confined, single-cell search at issue here. As stated above, we are all in agreement that all other aspects (excepting, possibly, the CIM evaluation) of any"investigation" being conducted by prison officials into Casto's death threat, e.g., the SENTRY search, fall within the discretionary function exception. What is at issue here is not any overall investigation, but how the cell search was conducted.
 
 
 [7]
 The discrete and focused nature of a single-cell search differs markedly from administrative or criminal investigations, which typically involve complex, multi-factored judgments, and which, if so allowed, could often continue into perpetuity. Not surprisingly, it is the complex nature of administrative and criminal investigations that has led this court and others to apply the discretionary function exception. See 93 F.3d at 1453-54 (finding that the allegedly negligent military investigation "was potentially influenced by a specific, highly political series of events: the Marine Corps' then-ongoing, and increasingly well-publicized investigation into abuses of Marine Corps flying privileges and resources by MCAS-El Toro officers"); Flax v. United States, 847 F. Supp. 1183, 1190 (D.N.J. 1994) ("[T]he agents had to balance several competing concerns, all of which are grounded in considerations of public policy . . . .[They had to balance] the potentially conflicting interests of apprehending the kidnappers but minimizing the risk of harm to the victim. Specifically, the agents were required to remain sufficiently close to [the kidnappers], but had to avoid alerting them . . . which would have presented a grave risk of injury to the victim.").
 
 
 [8]
 The majority distinguishes Huber by citing its language that the Coast Guard's action was not the result of a policy decision about allocation of rescue resources. Maj. op. at 526 (citing 838 F.2d at 400). This point, however, only begs the question. Because the Coast Guard in Huber had already decided to assist the sailboat, this court determined that its negligence in providing the assistance was not susceptible to policy analysis. In other words, this court concluded that the allegedly negligent actions taken by the Coast Guard did not involve discretion undergirded by public policy, and as such, liability stemming from the exercise of that discretion was not protected by the discretionary function exception. So too here, the prison officials had already decided to search Alfrey's cell. Once that allocation of prison resources was made, the search itself was but a ministerial exercise of implementation.
 
 
 [9]
 The record suggests that there were fights in the prison the night Alfrey was killed. I doubt, however, than any more resources would have been diverted from controlling those fights in order to conduct the cell search with due care, rather than negligently. Certainly, nothing in the record supports the majority's intimation to the contrary. Furthermore, neither the expenditure of nominally additional resources nor the existence of other attention-requiring actions shields the prison's negligent search of Alfrey's cell. See Huber, 838 F.2d at 401 (holding that the "chaos of the evening" did not excuse the Coast Guard's negligent implementation of its decision to help the sailboat).
 
 
 [10]
 Moreover, we ought to be especially cautious in basing any FTCA discretionary function immunity on an agency regulation granting discretion, as opposed to a statute, lest we permit an agency itself to define away FTCA liability that Congress intended to impose on it. At the very least, we ought to require such a regulation clearly to grant discretion, and for the exercise of that discretion to be policy-based. Such regulations also ought not be entitled to the "presumption" that we accord to a discretion-granting statute.